[No. H008155. Sixth Dist. Aug. 21, 1992.]

MONTEREY PENINSULA TAXPAYERS ASSOCIATION et al., Plaintiffs and Appellants, v.
COUNTY OF MONTEREY et al., Defendants and Respondents.

1522

COUNSEL

Timothy J. Morgan and Jonathan M. Coupal for Plaintiffs and Appellants.

Ronald A. Zumbrun, Anthony T. Caso and Alan W. Foutz as Amici Curiae on behalf of Plaintiffs and Appellants.

Douglas C. Holland, County Counsel, Leroy W. Blankenship, Deputy County Counsel, Ralph R. Kuchler, Jerrold A. Malkin, Remcho, Johansen & Purcell, Robin B. Johansen, Charles C. Marson and Paul Di Donato for Defendants and Respondents.

OPINION

CAPACCIOLI, Acting P. J.—

*Statement of the Case*

The Monterey Peninsula Taxpayers Association and others (collectively referred to as MPTA) filed an action against the County of Monterey (the County) and the Monterey County Public Repair and Improvement Projects Authority (the Authority) challenging the validity of a sales tax that was approved by only a simple majority of the voters. MPTA claimed, among other things, that article XIII A, section 4 (hereafter Section 4) of the California Constitution, commonly known as Proposition 13, required that the tax be approved by *two-thirds* of the voters.[1]

MPTA also claimed that the sales tax violated Government Code sections 53720-53730, commonly known as Proposition 62, which impose a similar supermajority approval requirement for special taxes.[2]

In the court below, both parties sought judgment on the pleadings and/or summary judgment. The court ultimately concluded that the complaint failed to state a cause of action, there were no triable issues of fact, and the County

[1]Proposition 13 was an initiative measure designed to "assure effective real property tax relief" by (1) controlling the tax rate and assessment of real property and (2) restricting the imposition of new taxes to replace lost real property tax revenues. (*Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization* (1978) 22 Cal.3d 208, 231 [149 Cal.Rptr. 239, 583 P.2d 1281].)

Section 4 provides, in pertinent part, "Cities, counties and special districts, by a two-thirds vote of the qualified electors of such district, may impose special taxes on such district, except ad valorem taxes on real property or a transaction tax or sales tax on the sale of real property within such City, County or special district."

[2]In particular, Government Code section 53722 provides, "No local government or district may impose any special tax unless and until such special tax is submitted to the electorate of the local government, or district and approved by a two-thirds vote of the voters voting in an election on the issue."

and Authority were entitled to judgment as a matter of law. It entered judgment accordingly.

Thereafter, MPTA moved to vacate the judgment and enter a new and different judgment. The court denied the motion but modified its judgment, adding the following specific findings: (1) the Authority is not a "special district" within the meaning of Section 4; (2) the sales tax *is* a "special tax" within the meaning of Proposition 62; but (3) the supermajority approval requirement therein is unconstitutional.

MPTA appeals from this judgment. It contends, among other things, that the sales tax violates Section 4. We agree and reverse the judgment.

*Facts*

In 1989, Sam Farr, California Assemblyman from Monterey and Santa Cruz Counties, introduced Assembly Bill No. 999 (AB 999) as an urgency measure to add section 7285.5 to the Revenue and Taxation Code.[3] The bill authorized rural counties to create agencies that could impose sales taxes for specific purposes with the approval of two-thirds of the agencies' members and a simple majority of the voters. (Stats. 1989, ch. 277, § 1.)[4] The Legislature passed the bill, and it became effective on August 7, 1989.

On August 8, 1989, the Monterey County Board of Supervisors, acting under this new power, created the Monterey County Public Repair and Improvement Projects Authority. (See appen. A.) The Authority was governed by four active members of the County Board of Supervisors. It was authorized to impose a sales tax increase and its purpose was to spend certain amounts of the new tax revenue on 27 specific improvement and repair projects throughout the County.

On August 9, 1989, the Authority passed a sales tax ordinance to become effective upon approval by a majority of the voters. (See appen. B.) Under the ordinance, the Authority would collect and deposit tax revenues in its "general fund" and then use specified amounts on the projects previously

---

[3]Unless otherwise specified, all further statutory references are to the Revenue and Taxation Code.

[4]In 1990, Assemblyman Farr introduced and the Legislature passed Assembly Bill No. 3670, making sections 7285 and 7285.5 applicable to all counties. (See Stats. 1990, ch. 1707, §§ 2-3.)

enumerated by the board of supervisors. The Authority ordered an election to submit the new ordinance to the voters for approval. The election was held on November 7, 1989. The tax ordinance was approved by a simple majority of the voters.

On January 5, 1990, MPTA filed this action. In February 1990, the Authority entered into agreements with the State Board of Equalization for the administration and operation of the sales tax. One agreement contained a provision outlining the Board of Equalization's rights if a court invalidated that tax and ordered a rebate or refund. Collection of the sales tax was scheduled to commence on April 1, 1990.

## Discussion

### I. The Authority Is a "Special District."

As noted above, Section 4 requires that any special taxes levied by special districts be approved by two-thirds of the electorate. (See fn. 1, *ante*, p. 1524.) The trial court found that the Authority was not a special district under Section 4. The undisputed evidence, however, establishes that it is.

### A. The Meaning of "Special District"

As this case progressed from complaint to judgment, the meaning of "special districts" in Section 4 was being litigated elsewhere. That litigation culminated in *Rider* v. *County of San Diego* (1991) 1 Cal.4th 1 [2 Cal.Rptr.2d 490, 820 P.2d 1000] (hereafter *Rider*), which was filed as the parties here were preparing their appellate briefs. We find it helpful to recount the evolution of the term "special districts."

The Supreme Court first addressed its meaning in *Los Angeles County Transportation Com.* v. *Richmond* (1982) 31 Cal.3d 197 [182 Cal.Rptr. 324, 643 P.2d 941] (hereafter *Richmond*). The facts of that case are simple. In 1976, the Legislature created the Los Angeles County Transportation Commission (LACTC) to develop a public transit system. The LACTC was authorized to levy a sales tax with the approval of a majority of the voters. (*Id.* at p. 199.) In 1978, Proposition 13 passed. Shortly thereafter, LACTC adopted a sales tax, and it was approved by a majority but less than two-thirds of the voters. Litigation ensued to determine the validity of the tax under Section 4.

In plurality and concurring opinions, a majority of the court explained that Section 4 was intended to restrict the ability of local taxing agencies to

impose *new* taxes to replace the loss of property tax revenue. They reasoned that since only those special districts which had imposed property taxes could try to replace the loss of such revenue, the term "special districts" referred to those agencies empowered to impose property taxes. (*Richmond, supra*, 31 Cal.3d at p. 206; see also *id.* at pp. 208-209 (conc. opn. by Kaus, J.).) Thus, since the LACTC could not impose property taxes, it was not a "special district." (*Id.* at p. 208; see also *id.* at p. 209 (conc. opn. by Kaus, J.).)

Justice Richardson dissented. He opined that the majority's view of a "special district" created a loophole making it easy for counties to avoid the supermajority voter requirement in Section 4 "by the simple creation of a district which is geographically precisely coterminous with a county, but which lacks its real property taxing power." *Richmond, supra*, 31 Cal.3d 197, 213 (dis. opn. by Richardson, J.).)

In response, the plurality stated, "We cannot assume that the Legislature will attempt to avoid the goals of [Proposition 13] by such a device. In any event, that problem can be dealt with if and when the issue arises. The legislation creating LACTC and granting it the power to levy only a sales tax antedated Proposition 13 by two years. Thus, there can be no claim here that the Legislature was attempting to evade the restrictions imposed by Section 4." (*Richmond, supra*, 31 Cal.3d at p. 208.)[5]

In *Rider, supra*, 1 Cal.4th 1, the Supreme Court addressed the issue acknowledged but left open by the plurality in *Richmond*: is an agency created to impose a tax that circumvents Proposition 13 a "special district" despite its lack of power to levy property taxes? (See *Richmond, supra*, 31 Cal.3d at p. 208.) A majority of the court answered "yes," opining that if the *Richmond* analysis extended to all districts that lack the power to tax property, regardless of when they were created, "special districts" as used in Section 4 would become meaningless. (*Rider, supra*, 1 Cal.4th 1, 11.) Indeed, the court noted that numerous "special purpose" districts were created after the *Richmond* decision, confirming Justice Richardson's prediction that the *Richmond* analysis would create a loophole in Proposition 13. (*Id.* at p. 10.)

Recognizing the difficulty of showing an intent to circumvent Proposition 13, a majority of the court held that such intent may be inferred "whenever

---

[5]In *Huntington Park Redevelopment Agency v. Martin* (1985) 38 Cal.3d 100, 106-107 [211 Cal.Rptr. 133, 695 P.2d 220], the court affirmed the analysis in *Richmond* but remained silent on the issue of intentional circumvention of Proposition 13. Justice Lucas, however, opined that *Richmond* was wrongly decided for the reasons set forth in Justice Richardson's dissent. (*Id.* at p. 110 (conc. and dis. opn. of Lucas, J.).)

the plaintiff has proved that the new tax agency is *essentially controlled* by one or more cities or counties that otherwise would have had to comply with the supermajority provisions of section 4." (*Rider, supra,* 1 Cal.4th 1, 11, italics added.) To aid this determination, the majority enumerated a variety of considerations. These include "the presence or absence of (1) substantial municipal control over agency operations, revenues or expenditures; (2) municipal ownership or control over agency property or facilities; (3) coterminous physical boundaries; (4) common or overlapping governing boards; (5) municipal involvement in the creation or formation of the agency; and (6) agency performance of functions customarily or historically performed by municipalities and financed through levies of property taxes." (*Id.* at p. 12.)

## B. Application of Rider

We acknowledge that the question of "essential control" "is one that necessarily must be made on a case-by-case basis, using the criteria suggested above." (*Rider, supra,* 1 Cal.4th 1, 12.) ▮ Here, the evidence relevant to this determination was fully developed below, the relevant facts are not in dispute, and they leave no room for a reasonable difference of opinion concerning the ultimate issue of essential control.[6] Under the circumstances, therefore, this issue becomes a question of law. (See *Terry* v. *Atlantic Richfield Co.* (1977) 72 Cal.App.3d 962, 967 [140 Cal.Rptr. 510]; cf. *Jolly* v. *Eli Lilly & Co.* (1988) 44 Cal.3d 1103, 1112 [245 Cal.Rptr. 658, 751 P.2d 923].) Indeed, both parties invite this court to rule as a matter of law on the issue of whether the Authority is a "special district."

Accordingly, we analyze the undisputed evidence in light of the *Rider* considerations and the facts of that case, which the court found to be "strong" evidence of intentional circumvention.

## 1. Control over the Authority

We first look at the amount of control the County has over the Authority's operations, revenues, and expenditures. (See *Rider, supra,* 1 Cal.4th 1, 12.)

In *Rider*, the act creating the agency gave it "*no* significant governmental discretion . . . with respect to *how* the tax revenues will be spent." (*Rider,*

---

[6]The only arguably relevant factual issue not developed below was whether the 27 projects to be funded by the sales tax were of the sort previously financed with property tax revenues. As we shall discuss below, however, evidence that property taxes had never been used for such projects would be of insufficient significance by itself to raise a triable issue of fact concerning whether the Authority was a "special district." (See *post,* p. 1533.)

*supra*, 1 Cal.4th 1, 6, italics in original.) Rather, the revenues were dedicated to constructing and operating the County's justice facilities. (*Id.* at p. 9.)

■ The evidence of control here is equally strong. The County created the Authority to impose a sales tax and directed it to spend up to certain amounts on specific projects. The County also specified the length of time the Authority may impose the tax, enumerated the Authority's powers, and directed it to hold at least one meeting per year conducted under rules of procedure similar to the rules of its own board of supervisors.

The County and Authority, however, point out that it is the Authority, not the County, that decides whether to impose a sales tax increase. They also note that the Authority has the discretion to enter contracts, sue and be sued, adopt a seal, use the County's real and personal property, resources, personnel, etc., "and do all things necessary or convenient to carry out the purposes for which it is established and created." Thus, they claim that the County's control is minimal and the Authority possesses "substantial discretion in setting priorities for spending revenues produced by the tax."

The Authority's discretion over whether to impose a tax is theoretical and does not indicate independence from the County. The Authority was created to raise revenue for the County; it was a foregone conclusion that it would impose a new tax; and it did so the day after it was created.

The Authority does have considerable discretion over the practical details of collecting the sales tax, implementing the expenditure of funds, and completing the projects. This power, however, is purely administrative and managerial in nature. The Authority may not spend more than the board of supervisors has allowed and may not fund projects of its own choosing. It is at all times strictly tethered to its designated purpose: to spend certain amounts of money on projects dictated by the board of supervisors. Thus, although the Authority's discretionary powers appear numerous, they do not provide substantive independence.

### 2. Ownership of Property

We next look at whether the County owns or has control over the Authority's property and/or facilities. (*Rider*, *supra*, 1 Cal.4th 1, 12.)

In *Rider*, the agency could hold title to land and facilities, but it was required to convey title to the County on request of the board of supervisors. (*Rider*, *supra*, 1 Cal.4th 1, 9.)

Here, the County enumerated the Authority's powers, which did not include authorization to purchase or own real property and facilities. Instead,

the County granted the Authority permission to "utilize real and personal property, facilities, resources, personnel, and services of the County of Monterey and its departments as may be necessary or convenient to carrying out its purposes and powers." This broad and unrestricted permission eliminated any need the Authority might have to own property, and there is no evidence the Authority owns or owned any property. Thus, it appears the County contemplated and successfully fostered a close, if not dependent, administrative relationship between it and the Authority. In so doing, the County was able to achieve essentially the same sort of control over the Authority that the County in *Rider* had over its agency with respect to property and facilities.

### 3. Boundaries and Governing Boards

We next look at the boundaries and governing boards of the County and Authority. (*Rider, supra,* 1 Cal.4th 1, 12.)

The County and Authority concede that their boundaries are coterminous and that they have "overlapping" boards. "Overlapping" is understatement. The Authority's board consists of four of the five County supervisors. Such "overlapping" renders the two boards essentially identical.

This degree of identity substantially enhances the County's control over the Authority's operations, revenues, expenditures, property, and facilities. It becomes even more significant in light of the facts of *Rider.* There, the initial version of the act creating the agency named the entire county board of supervisors as the agency's board of directors. (*Rider, supra,* 1 Cal.4th 1, 9.) However, "[t]he Legislative Counsel thereafter advised against creating such a close relationship between the Agency and the County, and the final version included only *two* county supervisors among the *seven* Agency directors." (*Ibid.,* italics added.)

### 4. Creation of the Authority

The next relevant consideration is the amount of County involvement in the creation/formation of the Authority. (*Rider, supra,* 1 Cal.4th 1, 12.)

In *Rider,* the *County* first tried to levy a special tax to pay for new justice facilities but it could not muster approval from two-thirds of the voters as required by section 4. The County then directed its state legislator to introduce legislation creating the San Diego County Regional Justice Facility Financing Agency (the Agency). The legislation authorized the Agency to levy a sales tax to fund justice facility improvements with approval of only

a majority of the voters. (See Gov. Code, §§ 26250-26285.) The Agency did so, and its tax was approved by 50.8 percent of the voters.

Here we note that in *1987*, Assemblyman Farr introduced a bill to add section 7285 to the Revenue and Taxation Code. Under this bill, rural counties, i.e., those with populations of less than 350,000, could levy sales taxes for *general* governmental purposes with the approval of a simple majority of the voters. (Stats. 1987, ch. 1257, § 2, p. 4470; see 73 Ops.Atty.Gen. 111, 114-115 (1990) [construing section 7285 as a "general" rather than "special" tax measure].)

Two years later, in 1989, Assemblyman Farr introduced AB 999 to add section 7285.5. As noted above, it allowed rural counties to create agencies to levy sales taxes for *specific* governmental purposes with the approval of a simple majority of the electorate.

The reason for this alternate revenue-raising mechanism is revealed in a report to the governor on AB 999 from the Office of Local Government Affairs.[7] It explains that under section 7285, Counties could impose "general taxes" with majority approval. However, one out of 15 counties that had attempted to do so was able to obtain simple majority approval of the tax. A postelection survey indicated that most voters would support a sales tax increase if and only if "such additional taxes were designated for a specifically described purpose." (Local Government Affairs Rep., p. 2.)

Assemblyman Farr's AB 999 addressed this problem. Under it, a tax measure proposed by a newly created agency would include an expenditure plan describing the specific projects for which the revenues would be dedicated. (Assembly Com. on Revenue and Taxation Rep. on AB 999 (Assembly Report), p. 2; Senate Rules Com. Rep. on AB 999 (Senate Report), p. 2.)

The record does not indicate that the County *directed* Assemblyman Farr to introduce AB 999. Nevertheless, as MPTA notes in its reply brief, Assemblyman Farr is a former member of the County Board of Supervisors.[8] Moreover, we may reasonably presume he acted on behalf of his constituents and in response to their needs. Indeed, obvious political considerations

---

[7] We have taken judicial notice of the legislative history of section 7285.5 (Assembly Bill Nos. 999 and 3670) because it sheds light on the purpose of section 7285.5 and the purpose of local taxes levied under its authority. (Evid. Code, §§ 459, subd. (a), and 452, subds. (a) and (h); cf. *Palmer* v. *Agee* (1978) 87 Cal.App.3d 377, 384 [150 Cal.Rptr. 841].)

[8] Although the record does not reveal this fact, we take judicial notice of it since it is a matter of public record not reasonably subject to dispute. (Evid. Code, §§ 459, subd. (a), and

would have made it difficult for him to sponsor a bill granting substantial new taxing power to counties other than his own. Understandably, therefore, his bill directly benefited the County, which immediately exercised its newly obtained power and created the Authority.

We further note that although the history of AB 999 reflects a legislative perception that *rural* counties needed help in finding new ways to raise revenue, it does not reveal how or why the size limitation on counties that could take advantage of AB 999 was set at 350,000 people. We point out, however, that the population of Assemblyman Farr's county in 1988 was over 341,000. (Horner, Cal. Cities, Towns & Counties (1988) Monterey Co., p. 475.)

In sum, therefore, we find the County significantly involved in creating the Authority.

### 5. Traditional County Functions

Finally, we focus on whether the Authority performed functions that are traditionally performed by the County and financed by property taxes. (*Rider, supra,* 1 Cal.4th 1, 12.)

It seems self-evident that the collection of taxes and their expenditure on repairs and improvements to public facilities and roads in the County are quintessential county functions. As the County vividly confirms in its brief, "Like many rural counties, Monterey County has a large backlog of public works projects that are languishing for lack of funding. The century-old Natividad Hospital—the first county hospital in California—is crumbling. A dangerously narrow stretch of Highway 101 in the northern part of the county is the scene of frequent tragic accidents. There is a serious shortage of libraries, senior centers, and mental health facilities to serve the county's growing population. [¶] To meet some of these needs, [the Authority] and the county voters passed [a sales tax increase] to fund 27 different projects. Some of the projects encompass things traditionally done by the County, but many do not. In fact, much of the money will go to improve state highways, construction that in better times would have been paid for with state and federal funds."

Contrary to the County's last assertion, however, counties have tradition-ally been directly involved in planning, funding, and realizing improvements

452, subd. (h); cf. *People* v. *Rhodes* (1974) 12 Cal.3d 180, 182, fn. 1 [115 Cal.Rptr. 235, 524 P.2d 363].)

to State highways within their borders. (See, e.g., Sts. & Hy. Code, §§ 760-762 & 790-797.)

It is unclear whether the projects that the Authority was to undertake were the type previously funded *exclusively* with property tax revenues. (See fn. 6, *ante*, p. 9.) If we assume they were not, however, this fact would not be of controlling significance. In *Rider*, the Supreme Court did not even mention whether the improvement of county justice facilities had previously been funded by real property taxes. Moreover, there is no reasonable basis to distinguish the improvement of county justice facilities from the improvement of other county facilities such as libraries, hospitals, transit systems, and roads.

### 6. Conclusion

In light of our discussion, it is clear to us that the Authority has no power over its own identity and destiny. It was not created to determine what public repairs and improvements were necessary and then finance them. Nor was it given discretion over certain broad subject areas. Rather, it is the County's surrogate tax collector and exists solely to do the supervisors' bidding: impose a sales tax, collect and manage the revenues, and use specified amounts on projects dictated by the County Board of Supervisors.

Under the circumstances, the undisputed evidence is susceptible of only one conclusion: the Authority is "essentially controlled" by the County and, therefore, is a "special district" within the meaning of section 4.

### II. The Sales Tax Is a "Special Tax"

Since the trial court found that the Authority was not a "special district," it did not address whether the sales tax is a "special tax" under Section 4. We conclude that it is.[9]

In *City and County of San Francisco* v. *Farrell* (1982) 32 Cal.3d 47 [184 Cal.Rptr. 713, 648 P.2d 935], the court held that "special taxes" were those levied for a "specific purpose" and not those "placed in the general fund to be utilized for general governmental purposes." (*Id.* at p. 57.)

In *Rider*, *supra*, 1 Cal.4th 1, 13, the Agency claimed that although the sales tax had a specific purpose, it was nevertheless a "general tax" because

---

[9]Again, the facts relevant to this question were fully developed below and at this point present a question of law.

the revenues were placed in its general fund for the general governmental purposes of *the Agency*. The majority disagreed. It asserted that "if the County had directly adopted the tax in question, earmarking its revenues for the special, limited purpose of financing the County's justice facilities, it would have been deemed a 'special tax' under *Farrell*." The majority observed, "[I]t would be anomalous if the 'special' tax of one agency could so readily become the 'general' one of another." (*Rider*, *supra*, 1 Cal.4th at p. 15.)

According to the majority, "A more reasonable interpretation of section 4, consistent with *Farrell*'s (*supra*, 32 Cal.3d 47) guidelines, is that a 'special tax' is one levied to fund a specific governmental project or program, such as the construction and financing of the county's justice facilities." (*Rider*, *supra*, 1 Cal.4th at p. 15.) The court acknowledged that "under the foregoing principle, *every* tax levied by a 'special purpose' district or agency would be deemed a 'special tax.' But this interpretation seems most consistent with the probable intent of the framers of Proposition 13." (*Ibid.*)

The County and Authority claim that only three justices of the majority in *Rider* agreed on this definition of "special taxes." They argue that although Justice George agreed with the *conclusion* that the tax at issue was a special tax, he disagreed with the underlying reasoning. This is not so.

Chief Justice Lucas authored the majority opinion and was joined by Justices Arabian, Baxter, and George. (*Rider*, *supra*, 1 Cal.4th 1, 16.) Justice George wrote a separate concurring opinion because he believed the case should have been decided under Proposition 62. (*Rider*, *supra*, 1 Cal.4th 1, 16 (conc. opn. of George, J.).) Nowhere, however, does he disagree with the analysis in the majority opinion.

The County and Authority argue that Justice George rejected the majority's view that every tax imposed by a "special district" would be a "special tax." (*Rider*, *supra*, 1 Cal.4th 1, 15.) They cite a footnote in his concurrence, in which he opined, "Some special districts or agencies may have broad enough authority over a sufficient number of different subject areas that a tax whose proceeds are not earmarked for a specific purpose and are to be deposited in the district's general fund may properly be considered a general tax. When such multipurpose local districts are involved, the legislative designation of a tax as a general, rather than a special, tax may be significant." (*Rider*, *supra*, 1 Cal.4th 1, 19, fn. 2 (conc. opn. of George, J.).)

Building on this footnote, the County and Authority point out that the sales tax here was levied to fund *several* specific governmental projects

rather than one, as in *Rider*. They assert that the Authority has "extremely broad powers over a wide range of 27 projects," and "[t]he projects themselves manifestly serve 'general governmental purposes.'" Consequently, they argue that the sales tax levied to finance them should be deemed a *general* tax. We disagree.

Justice George's footnote is part of his discussion concerning the scope of *Proposition 62*. Proposition 62 broadly applies to any "district," that is, any "agency of the state, formed pursuant to general law or special act, for the local performance of governmental or proprietary functions within limited boundaries." (Gov. Code, § 53720.) Section 4, on the other hand, is more narrowly focused on "special districts": (1) pre-Proposition 13 agencies that have the power to levy property taxes, and (2) post-Proposition 13 agencies that are "essentially controlled" by county that created it. In light of this difference, Justice George's footnote is not necessarily a rejection of the majority's observation that taxes levied by a *Section 4* special district would invariably be "special taxes."

We next observe that the Authority does not have broad discretionary power over a number of general subject areas. As previously discussed, it has no discretion to determine what projects to complete or the maximum amount it can spend on any one project. Thus, even under Justice George's view, the tax here would still fall within the *statutory* definition of "special tax" in Proposition 62. Not surprisingly, the trial court made this very finding.

■ The County and Authority next argue that a "special tax" is a tax restricted to a *single*, specific government project or program. Assuming the Authority is a "special district," they apparently concede that had it levied a tax for one of the 27 projects, it would have needed the approval of a supermajority. According to the County and Authority, however, this requirement does not apply to a group of otherwise specific taxes if they are stacked together.

In our view, such stacking is camouflage and does not suddenly convert a multi-*specific*-purpose tax into a "general tax" for "general governmental purposes." A single tax with certain amounts earmarked for specific projects is categorically different from revenues that are deposited in the general fund and available for expenditure for any and all governmental purposes.

As we previously explained, one of the considerations the *Rider* court found relevant in determining whether an agency was a "special district" is whether the project or program to be financed by the new tax was previously

financed by property taxes. (*Ante*, pp. 1528, 1532-1533.) The County and Authority now argue, in essence, that "special taxes" are only those new taxes earmarked for purposes for which property taxes had been used. Thus, if previous funding for a current project cannot be traced to property tax revenues, then Section 4 is inapplicable.

This view of "special taxes" is analogous to the definition of "special district" enunciated in *Richmond*, i.e., one that could impose a property tax. As the Court acknowledged in *Rider*, however, that definition created a loophole in Proposition 13 and allowed its circumvention. Mindful of this experience, we decline to adopt a historical tracing approach to define "special taxes." Such a definition could also open a loophole in Proposition 13, exempting whole categories of specific programs and projects that were never funded with property tax revenue. Moreover, as noted above, the *Rider* court, in finding the tax for justice facilities a "special tax," did not mention whether or not the improvement of county justice facilities had in the past been funded all or in part by taxes on real property. Under the circumstances, we are not persuaded to view "special taxes" differently than did the majority in *Rider*: "a 'special tax' is one levied to fund a specific governmental project or program, such as the construction and financing of . . . justice facilities." (*Rider, supra,* 1 Cal.4th at p. 15; see *City and County of San Francisco* v. *Farrell, supra,* 32 Cal.3d 47, 57.)

As should be clear from our discussion, the evidence conclusively establishes that the sales tax levied by the Authority is a "special tax."

### III. Rider applies

Our analysis under *Rider* leads us to conclude that the sales tax violates Section 4. The County and Authority, however, strenuously urge us to hold that *Rider* applies prospectively only, that is, to agencies created after *Rider* became final.[10]

The majority in *Rider* declined to address "the question of a possible prospective application" of its holding to agencies other than the agency before it because "[the issue] involves difficult constitutional and policy considerations largely unbriefed in this case." (*Rider, supra,* 1 Cal.4th at p. 13. It observed that "resolution of the prospectivity issue may depend on a variety of *case-specific factors,* including the degree of hardship or other adverse consequences that would result from a retroactive application of our holding *in a particular setting.*" (*Ibid.,* italics added.)

---

[10]The County and Authority are joined by 50 cities and towns located throughout California, who were granted permission to file an amicus curiae brief.

We analyze the issue in light of the particular circumstances of this case.

In *Estate of Propst* (1990) 50 Cal.3d 448 [268 Cal.Rptr. 114, 788 P.2d 628], the court explained when a judicial decision should be given prospective application. ■ "Generally, judicial decisions are applied retroactively. [Citation.] This general principle is subject to two virtually universal exceptions, based on considerations of fairness and public policy. A decision announcing a change in a judicial rule of law is rarely, if ever, a basis for disturbing a final judgment based on the prior rule. [Citations.] Nor will the new decision be applied to impair contracts made or property rights acquired in accordance with the prior rule. [Citations.] . . . . [¶] Fairness and public policy may be the basis for additional exceptions to retroactivity. [Citations.] Considerations of public policy include the purpose of the new rule and the effect of retroactivity on the administration of justice. [Footnote omitted.] The issue of fairness encompasses the extent of reliance on the old standards by the parties or others similarly situated, and the ability of litigants to foresee a change in the law. [Citations.]" (*Id.* at pp. 462-463.)

## A. Reliance on Established Precedent

■ The County and Authority assert that *Rider* "effectively reversed a decade's jurisprudence regarding the scope and effect of Proposition 13." They claim they relied on pre-*Rider* law, specifically, the *Richmond* interpretation of "special district," i.e., one that can levy property taxes. They argue that their reliance was reasonable and justified because subsequent cases applied *Richmond* without hinting that an agency that cannot impose property taxes might under certain circumstances be deemed a "special district."[11] Thus, according to the County and Authority, "Nothing in the case law or political history of the post-Proposition 13 tax reform movement could have prepared local governments for the decision in *Rider*." We are unconvinced.

As noted above, the plurality in *Richmond*, prodded by Justice Richardson, acknowledged but left open the question of whether an agency created to circumvent Proposition 13 but lacking the power to levy property taxes could be deemed a "special district." *Rider* answered this question. In so doing, it merely declared what section 4 has meant from the beginning. Moreover, *Rider* did not overrule *Richmond*, reverse a well-settled, judicially

---

[11]In particular, they cite *Huntington Park Redevelopment Agency v. Martin, supra,* 38 Cal.3d 100; *City and County of San Francisco v. Farrell, supra,* 32 Cal.3d 47; *Alamo Rent-A-Car, Inc. v. Board of Supervisors* (1990) 221 Cal.App.3d 198 [272 Cal.Rptr. 19]; *Altadena Library Dist. v. Bloodgood* (1987) 192 Cal.App.3d 585 [237 Cal.Rptr. 649]; and *Arvin Union School Dist. v. Ross* (1985) 176 Cal.App.3d 189 [221 Cal Rptr. 720].

created rule of law or clearly break with the past. (Compare *Moradi-Shalal* v. *Fireman's Fund Ins. Companies* (1988) 46 Cal.3d 287 [250 Cal.Rptr. 116, 758 P.2d 58] [overruling *Royal Globe Ins. Co.* v. *Superior Court* (1979) 23 Cal.3d 880 [153 Cal.Rptr. 842, 592 P.2d 329] and thereby abolishing the previously recognized and regularly employed right of action against an insurer for unfair practices that violated the Insurance Code].)

Indeed, as to agencies created *before* the passage of Proposition 13, *Richmond* remains definitive on the meaning of "special district." Moreover, the holdings in *Richmond* and *Rider* are wholly compatible means of effectuating the purpose of section 4, which, as explained in *Richmond*, was to restrict the ability of local taxing agencies to impose new taxes to replace the loss of property tax revenue. (*Richmond, supra,* 31 Cal.3d 197, 206.) *Rider* simply held that local governments may not do indirectly what *Richmond* found section 4 prohibited them from doing directly.

It is true that before *Rider*, several cases applied the *Richmond* holding without discussing the issue of intentional circumvention. A close look at these cases, however, reveals that such a discussion would have been unnecessary.

For example, in *Altadena Library Dist.* v. *Bloodgood, supra,* 192 Cal.App.3d 585 and *Arvin Union School Dist.* v. *Ross, supra,* 176 Cal.App.3d 189 the issue of circumvention did not arise because the agencies involved, like that in *Richmond*, were created *before* the passage of Proposition 13.

In *Huntington Park Redevelopment Agency* v. *Martin, supra,* 38 Cal.3d 100, Justice Lucas concurred with the majority's conclusion that a redevelopment agency lacking the power to tax property was not a "special district." (*Id.* at p. 110 (conc. and dis. opn. of Lucas, J.).) He did so because he felt compelled by *Richmond*, which, however, he believed to have been wrongly decided for the reasons stated in Justice Richardson's dissent. Under the circumstances, we may reasonably assume that the agency in *Huntington Park* predated Proposition 13, for if it had been created thereafter, Justice Lucas would not have felt bound by *Richmond*.

In *City and County of San Francisco* v. *Farrell, supra,* 32 Cal.3d 47 and *Alamo Rent-A-Car, Inc.* v. *Board of Supervisors, supra,* 221 Cal.App.3d 198,

the issue was not whether a particular agency was a "special district" but whether a particular user fee was "special tax."[12]

In sum, we do not doubt that the County *believed* the Authority was not a special district because it lacked the power to tax property. Given the issue left unresolved in *Richmond,* however, this belief was based more on hopeful legal speculation than a settled and clearly applicable judicial definition of the term "special district."

Moreover, *Richmond* and its progeny do not imply that section 4 would be deemed inapplicable to agencies and taxes designed to circumvent the supermajority voter approval requirement. Nor do they implicitly authorize the imposition of a tax for specific county projects by an agency that was created, dominated, and controlled by a county. Finally, given the dissent in *Richmond* and its persuasive effect on Justice Lucas in *Huntington Park,* the County cannot reasonably claim that the decision in *Rider* was a completely unforeseeable legal development. Indeed, the *Rider* court merely upheld the previous conclusion of the superior court, which, as noted above, deemed an agency created to circumvent Proposition 13 a "special district" despite its lack of power to impose a property tax. The superior court's decision was rendered on March 21, 1989, long before the Authority here was created.

Although we do not know whether the County knew about this superior court decision before it created the Authority, it would not be unreasonable to assume so given the importance of such tax cases to the counties throughout the state. We note that the superior court's decision was noted in a Senate Revenue and Taxation Committee Report on AB 999, which observed, "Some might argue that the creation of a special purpose authority goes against the intent of Proposition 13, which is to require that special purpose taxes need a 2/3 vote. There is a recent Superior Court ruling that San Diego's jail authority did conflict with Proposition 13. The case is currently on appeal. If the Superior Court's position is upheld, then it appears that this legislation would not be constitutional." Moreover, Monterey County became an amicus before the Supreme Court in *Rider.*

The County and Authority also claim they reasonably relied on section 7285.5, which authorized creation of the Authority and imposition of a special purpose sales tax increase with the approval of a simple majority of electorate.

---

[12]We acknowledge that in *Alamo,* the court, citing *Richmond,* opined that when the board of supervisors acted as operator and proprietor of the local airport, it was not a "special district" because in *that* capacity it lacked the power to tax property. (*Alamo, supra,* 221 Cal.App.3d 198, 203.) The County and Authority, however, could not have relied on this dicta because *Alamo* was filed long after the Authority was created and its sales tax imposed.

Section 7285.5, however, does not explicitly sanction the particular actions taken thereunder by the County, and the legislative history of AB 999 suggests it would have been unreasonable for the County to have thought that it did.

Before AB 999 was passed, its constitutionality had been questioned. The Assembly Report pointed out that it did not restrict the composition of county-created authorities. Thus, it was theoretically possible "for all the members of the board of supervisors to be the sole members of the authority." (Assem. Rep., p. 3.) It warned that "under Proposition 13, local entities that have the authority to levy a property tax (board of supervisors) cannot impose a special tax by a majority vote. This bill could be in violation of Proposition 13 if a membership restriction is not included, since this bill only requires a majority vote of the electorate for the imposition of a transactions and use tax." (*Ibid.*)[13]

The same point was made in a Senate Committee Report. (See Sen. Rev. & Tax. Com. Rep., p. 3.) Although this observation did not change the text of the bill, it should have put the County's legislative representative, if not the County Board of Supervisors, on notice concerning possible limitations on the exercise of authority under the statute. Thus, we find it difficult to accept the County's claim that it *reasonably* relied on the statute in making the Authority's board virtually identical to its own board of supervisors and believing it was still exempt from Section 4.

### B. Contravention of Public Policy

The County and Authority contend that retroactive application of *Rider* would contravene public policy. They claim that constitutional and statutory prohibitions against referenda on taxes and injunctions against collecting taxes (Cal. Const., art. II, § 9, subd. (a) and art. XIII, § 32; Rev. & Tax. Code, § 6931) reflect a strong public policy favoring the collection of taxes so as to promote fiscal stability. (See *Pacific Gas & Electric Co.* v. *State Bd. of Equalization* (1980) 27 Cal.3d 277, 283 [165 Cal.Rptr. 122, 611 P.2d 463]; *Geiger* v. *Board of Supervisors* (1957) 48 Cal.2d 832, 839-840 [313 P.2d 545].) They argue that applying *Rider* to taxes that have already been levied would disrupt budget processes. It would require new elections to obtain supermajority reapproval of taxes before the previously collected tax revenue could be included in financial plans.

---

[13]It was also noticed that since any tax measure adopted pursuant to AB 999 would include a specific expenditure plan, the tax would become a "special tax" within the meaning of Proposition 13 and thus require approval by two-thirds of the electorate rather than a majority, as provided in the bill. (Sen. Rules Com. Rep., p. 3.)

The County and Authority concede that special elections can be held within a couple of months of a decision to hold one. Their concern, however, is that "[f]or fiscally strapped counties, the *cost* of a special election at which turnout will be low and at which the measure may be defeated simply cannot be justified." Thus, as a practical matter, counties will wait and place the tax on the ballot at an annual election. (See Elec. Code, § 2500.) Again, the County and Authority concede, "These dates come frequently enough; the wait will rarely be more than a month or two longer than if a special election were called." They suggest, however, that the number of issues on the ballot and the inability of local governments to actively campaign in favor of new taxes can make it difficult to obtain a supermajority. And, "[o]nce the electorate has voted down a tax measure, it is not likely to pass it again."

First, the prohibitions against tax referenda and injunctions do not promote fiscal stability by immunizing taxes from constitutional scrutiny and judicial invalidation. Nor do they sanction budgetary reliance on revenues generated by an unconstitutional tax. Thus, the public policy behind these prohibitions does not compel us to ignore an intentional circumvention of Proposition 13, ratify an otherwise unconstitutional tax, and thereby authorize its collection for years to come.

Fiscal stability also does not clearly outweigh the purpose of Proposition 13 and the goal achieved by applying *Rider*: effective real property tax relief, the assurance of continued relief via a supermajority voter approval requirement, and the immediate elimination of taxes that circumvented Proposition 13 and thwarted its purpose.

Finally, the difficulty counties might encounter in obtaining supermajority approval of taxes in new elections is part of the defense against new taxes Proposition 13 was intended to provide in the first place. Although new elections on taxes that previously should have been approved by a supermajority may disrupt fiscal planning, they would vindicate rights under Section 4 that had been violated.[14]

## C. Unfairness and Hardship

The County and Authority contend that application of *Rider* will cause severe and substantial hardship to Monterey County. They generally claim that if the sales tax is invalidated, they will be unable to accomplish the 27 projects the tax was designated to fund.

---

[14]The County does not discuss or consider the possibility of restructuring the Authority so as to surrender "essential control" over it and thereby eliminate its status as a "special district" under Section 4.

We appreciate the hardship suffered by the residents of Monterey County due to a dilapidated public hospital, inadequate library facilities, and over-crowded highways and roads. However, Section 4 requires, and has always required, supermajority approval of new special taxes *regardless* of how badly the revenues were needed. Thus, to exempt the County's sales tax from Section 4, we must find that invalidating it would cause compelling hardship different from that which motivated the County to circumvent Proposition 13 in the first place.

Although application of *Rider* will no doubt frustrate plans to begin immediately the designated repair and improvement projects and thereby prolong the hardship caused by the current condition of county facilities and roads, it will not itself permanently preclude or prohibit completion of any project. Nothing in *Rider* prevents the County from seeking proper approval of the sales tax or reimposing it in a way that does not violate or circumvent Proposition 13.

We note that after collection of the sales tax commenced, the Authority impounded the revenues and limited expenditure to investment, financial management, and legal defense costs.[15] Nevertheless, the County points out that because it has been unable to use the sales tax revenues to *start* construction of a new medical facility, it has been forced to make interim repairs to the old hospital even though it "will have to be rebuilt long before the useful life of these repairs is exhausted[.]" The County further notes that it has lost, and may continue to lose, state matching funds for its libraries and highway projects and has been forced to stop paying certain cities for the use of their libraries by noncity residents of the County.

The interim repairs to the County hospital and loss of matching funds for libraries and roads were inevitable in the absence of a new source of funds. Thus, although these consequences emphasize the underlying need for the sales tax, they do not make it unfair to apply *Rider* or that its application imposes unexpected and unreasonable hardships apart from those the tax was intended to alleviate.

The County notes, however, that the *state* "has already spent $2.0 million of a $2.7 million contract awarded to design the [Prunedale-Highway 101] project and obtain environmental approval" and argues that if sales tax

---

[15]The County and Authority implicitly criticize MPTA because it "made no effort to *restrain* the collection of the tax, which began on April 1, 1990 . . . ." (Italics added.) They do not suggest what MPTA should have attempted to do, and their criticism is surprising in light of the constitutional and statutory provisions they cite prohibiting injunctions against collection of taxes.

revenues are not available for the project, the money that has been spent will have been wasted.

The County similarly points out that "Caltrans contracted with a private consultant for $4.15 million to obtain environmental clearance and to do a preliminary design for the Highway 68 project" and that this work has begun. Thus, if tax revenues "are unavailable, and the improvements to Highway 68 are not completed, a great deal of public money will have been wasted."

The County next states that it has paid a private consultant $180,000, with another $20,000-$30,000 remaining on the contract, for an environmental study concerning another project to widen Carmel Valley Road to permit new development. It argues that if sales tax revenues are not available for the underlying project, "it will be difficult if not impossible to find alternative sources of funding for the project and the $200,000 investment will have been largely wasted."

We disagree that invalidating the sales tax will automatically render the money spent on preliminary design and environmental reports on a few of projects wasted, for it does not mean the projects for which the reports were prepared cannot and never will be completed. Again, nothing except the will of the electorate can prevent the County from imposing a new and constitutional sales tax to fund the County's projects. Moreover, the application of *Rider* will not affect the informational value and validity of the reports. It merely postpones their usefulness.

### D. Conclusion

In sum, it does not appear that in reliance on the sales tax, the County has taken substantial and material steps that will irremediably worsen its present condition if the sales tax is invalidated. Although the expenditure of some money may have been premature or even unnecessary, it does not justify waiving the constitutional defect in the sales tax and permitting the collection of additional hundreds of millions of dollars that could not be legally collected. Moreover, the record does not reveal that invalidation of the tax will disrupt major construction activity that has begun on any of the improvement and repair projects, interfere with the performance of any contractual obligations relating to the completion of such work, or impair vested rights that have arisen because projects have been started.

Under the circumstances, therefore, we do not find the hardship to the County so compelling as to outweigh the considerations that underlie the

basic rule of retroactivity. Therefore, we decline to hold that *Rider* applies prospectively only.

## *IV. Disposition*

The judgment is reversed.[16] Appellants are entitled to their costs on appeal. (Cal. Rules of Court, rule 26(a).)

Premo, J., and Elia, J., concurred.

---

[16]In light of our conclusion, we need not address the other issues raised by the parties—namely, whether the sales tax violates Proposition 62 and if so, whether Proposition 62 is itself constitutional.

APPENDIX A

*Before the Board of Supervisors in and for the*
*County of Monterey, State of California*

RESOLUTION NO. 89-448

RESOLUTION CREATING THE MONTEREY )
COUNTY PUBLIC REPAIR AND IMPROVEMENT )
PROJECTS AUTHORITY AND SPECIFYING )
ITS PURPOSES . . . . . . . . . . . . . )

WHEREAS, Assembly Bill 999 (Farr) was passed by the Legislature as an urgency measure during the 1989 Regular Session, was allowed to pass into law without signature of the Governor on August 7, 1989, and was chaptered by the Secretary of State on August 7, 1989, as Chapter 277 of the Statutes of 1989; and

WHEREAS, AB 999 authorizes the board of supervisors of any county with a population of 350,000 or less on January 1, 1987, to establish an Authority for specific purposes; and

WHEREAS, the County of Monterey meets the criteria to establish such an Authority; and

WHEREAS, the Board of Supervisors desires to create such an Authority for the purposes as hereinafter set forth.

NOW, THEREFORE, BE IT RESOLVED as follows:

1. That, pursuant to AB 999 (Statutes of 1989), there is hereby created and established in the County of Monterey the Monterey County Public Repair and Improvement Projects Authority;

2. That, in addition to any other taxes authorized by law, the Authority may impose a transactions and use tax conforming to Part 1.6 (commencing with Section 7251) of the Revenue and Tax -

code at a rate of one-half of one percent (1/2%) for the purposes for which the Authority is established. Such tax may be imposed and collected for a period not to exceed twenty years from and after the operative date of an ordinance passed and adopted by the Authority for the purpose of imposing such tax; and

3. That the Authority shall have as its specific purposes the raising and expending of the following sums of money for the uses stated:

| PUBLIC REPAIR AND IMPROVEMENT PROJECTS | TOTAL COST TO BE BORNE BY ONE HALF CENT SALES TAX |
|---|---|
| **TRANSPORTATION** | |
| ROADS AND HIGHWAYS | |
| Hwy 101 Bypass including Right of Way | $123,500,000 |
| Hwy 68/Corral-San Ben. Highway Improvements | 33,550,000 |
| Salinas Westside Road Improvements | 12,500,000 |
| Carmel Valley Road | 25,600,000 |
| 183-156 Intersection | 2,000,000 |
| Hwy 1-Salinas Rd Intersection | 14,000,000 |
| Rossi Street Extension | 750,000 |
| Jolon Rd: Proj 1 to Hwy 101 | 2,000,000 |
| Hwy 68/Hwy 1 to Hwy 218-Canyon del Rey | * |
| Hwy 68/Holman Highway to Community Hospital | * |
| Hwy 68/Corral-San Ben. to Hwy 218-Canyon del Rey | * |
| Hwy 101/Greenfield/Walnut Avenue Onramp | * |
| PUBLIC TRANSIT | |
| Monterey Salinas Transit including Existing Operations and Specialized Transit: Elderly/Hncppd/Disadvntged/Youth services administered by MST | $20,000,000 |
| Subtotal | $233,900,000 |
| | |
| **NATIVIDAD MEDICAL CENTER** | |
| Replace Natividad Hospital | $82,000,000 |
| New Facility Operations/Trauma Care | 8,000,000 |
| Subtotal | $90,000,000 |
| | |
| **LIBRARIES** | |
| Carmel, Monterey, Pacific Grove and Salinas Library Subsidy | $8,900,000 |
| Marina Regional | 2,250,000 |
| Carmel Valley Branch | 1,600,000 |
| Soledad Regional | 1,000,000 |

| | | |
|---|---:|---:|
| Greenfield Branch/Community Facility | | 1,350,000 |
| Gonzales Branch | | 1,350,000 |
| Book Purchases | | * |
| | Subtotal | $16,450,000 |

| MENTAL HEALTH | | |
|---|---:|---:|
| Outpatient Treatment | | $10,000,000 |
| Homeless Mentally Ill Housing Loan | | 10,000,000 |
| | Less Repayment | (10,000,000) |
| | Subtotal | $10,000,000 |

| COMMUNITY PROJECTS | | |
|---|---:|---:|
| Salinas Senior Center | | $2,000,000 |
| Sand City/Marina Dunes | | 2,500,000 |
| King City Teen Center | | 650,000 |
| | Subtotal | $5,150,000 |

| | | |
|---|---:|---:|
| TOTAL PROJECTS** | | $355,500,000 |

*To be funded in order listed if monies become available within
the category.
**Projects will be added upon voter approval should funds
become available.

 4. That the Authority shall have all the powers set
forth in said AB 999 (Statutes of 1989) and shall have the
following additional powers:

 a. The Authority may enter into contracts as necessary
or convenient to carrying out its purposes and powers.

 b. The Authority may sue and be sued, except as
otherwise provided by law, in all actions and proceedings, in
all courts and tribunals of competent jurisdiction. All
claims for money or damages against the Authority shall be
governed by Division 3.6 (commencing with Section 810) of
Title 1 of the Government Code, except as provided therein,
or by other statutes or regulations expressly applicable
thereto.

 c. The Authority may adopt a seal and alter it at its

pleasure.

　　d.　The Authority may utilize real and personal property, facilities, resources, personnel, and services of the County of Monterey and its departments as may be necessary or convenient to carrying out its purposes and powers.

　　e.　The Authority may do all things necessary or convenient to carry out the purposes for which it is established and created.

4.　That the Authority shall be organized as follows:

　　a.　The Authority shall be governed by a Board of Directors appointed by the Board of Supervisors and consisting of four members. Each Director must be a member of the Board of Supervisors and shall serve for a one year term.

　　b.　The Board of Directors shall have a Chair and a Vice Chair who shall be elected by a majority vote of all the members of the Authority, who shall hold office at the pleasure of the Authority not to exceed one year, and who shall have such duties as the Authority may prescribe.

　　c.　The Authority shall hold at least one regular meeting each year during the month of August. All meetings of the Authority shall be called, held, and conducted in accordance with the provisions of the Ralph M. Brown Act.

　　d.　The Authority shall adopt rules of procedure which shall be similar to the rules of the Board of Supervisors as set forth in Chapter 2.04 of the Monterey County Code and may

adopt such other policies, rules, and regulations as may be necessary or convenient.

BE IT FURTHER RESOLVED that this Resolution shall take effect immediately.

Upon motion of Supervisor ___Del Piero___, seconded by Supervisor _Strasser Kauffman_, the foregoing Resolution is hereby passed and adopted this __8th__ day of _August_____, 1989, by the following vote:

> AYES: Supervisors Del Piero, Shipnuck, and Strasser Kauffman.
>
> NOES: Supervisor Petrovic.
>
> ABSENT: Supervisor Karas.

Chairwoman of the Board of
Supervisors, Monterey County
State of California

ATTEST:

ERNEST K. MORISHITA
Clerk of the Board

By: _____ Deputy

I, ERNEST K. MORISHITA, Clerk of the Board of Supervisors of the County of Monterey, State of California, hereby certify that the foregoing is a true copy of an original order of said Board of Supervisors duly made and entered in the minutes thereof at page ____ of Minute Book _63___ on _August 8, 1989_
Dated, August 8, 1989

ERNEST K. MORISHITA, Clerk of the Board
of Supervisors, County of Monterey,
State of California.

By _____ Deputy

EXHIBIT 1 p. 5

APPENDIX B

## MONTEREY COUNTY PUBLIC REPAIR AND IMPROVEMENT PROJECTS AUTHORITY

## ORDINANCE NO. 89-01

## ORDINANCE IMPOSING TRANSACTION AND USE TAX

The Monterey County Public Repair and Improvement Projects Authority ordains as follows:

SECTION 1. PURPOSE AND INTENT. The purpose of this ordinance is to implement State law allowing the voters to decide upon a one-half of one percent (1/2%) countywide transaction and use tax to be used to expeditiously finance the repair and improvement of the public facilities and services designated in this ordinance.

SECTION 2. COUNTYWIDE TRANSACTION AND USE TAX. There is hereby imposed in the incorporated and unincorporated territory of the County of Monterey, in accordance with Part 1.6 (commencing with Section 7251) and as specifically authorized by Section 7286 of the Revenue and Taxation Code, a transaction and use tax at the rate of one-half of one percent (1/2%) in addition to any existing or future authorized state or local sales tax or transaction and use tax.

SECTION 3. PURPOSES OF TAX. Proceeds of the tax imposed by this ordinance shall be deposited into the general fund of the Monterey County Public Repair and Improvement Projects Authority

1

*172*

and such proceeds shall be used for the following stated uses:

| PUBLIC REPAIR AND IMPROVEMENT PROJECTS | TOTAL COST TO BE BORNE BY ONE HALF CENT SALES TAX |
|---|---|
| **TRANSPORTATION** | |
| **ROADS AND HIGHWAYS** | |
| Hwy 101 Bypass including Right of Way | $123,500,000 |
| Hwy 68/Corral-San Ben. Highway Improvements | 33,550,000 |
| Salinas Westside Road Improvements | 12,500,000 |
| Carmel Valley Road | 25,600,000 |
| 183-156 Intersection | 2,000,000 |
| Hwy 1-Salinas Rd Intersection | 14,000,000 |
| Rossi Street Extension | 750,000 |
| Jolon Rd: Proj 1 to Hwy 101 | 2,000,000 |
| Hwy 68/Hwy 1 to Hwy 218-Canyon del Rey | * |
| Hwy 68/Holman Highway to Community Hospital | * |
| Hwy 68/Corral-San Ben. to Hwy 218-Canyon del Rey | * |
| Hwy 101/Greenfield/Walnut Avenue Onramp | * |
| **PUBLIC TRANSIT** | |
| Monterey Salinas Transit including Existing Operations and Specialized Transit: Elderly/ Hndcppd/Disdvntged/Youth services administered by MST | $20,000,000 |
| Subtotal | $233,900,000 |
| **NATIVIDAD MEDICAL CENTER** | |
| Replace Natividad Hospital | $82,000,000 |
| New Facility Operations/Trauma Care | 8,000,000 |
| Subtotal | $90,000,000 |
| **LIBRARIES** | |
| Carmel, Monterey, Pacific Grove and Salinas Library Subsidy | $8,900,000 |
| Marina Regional | 2,250,000 |
| Carmel Valley Branch | 1,600,000 |
| Soledad Regional | 1,000,000 |
| Greenfield Branch/Community Facility | 1,350,000 |
| Gonzales Branch | 1,350,000 |
| Book Purchases | * |
| Subtotal | $16,450,000 |
| **MENTAL HEALTH** | |
| Outpatient Treatment | $10,000,000 |
| Homeless Mentally Ill Housing Loan | 10,000,000 |
| Less Repayment | (10,000,000) |
| Subtotal | $10,000,000 |
| **COMMUNITY PROJECTS** | |
| Salinas Senior Center | $2,000,000 |
| Sand City/Marina Dunes | 2,500,000 |

2

```
ᵣᵢₙg City Teen Center 650,000
 Subtotal $5,150,000
─────────────────────────────────────────────────────────────
 TOTAL PROJECTS** $355,500,000
─────────────────────────────────────────────────────────────
```
*To be funded in order listed if monies become available within the category.
**Projects will be added upon voter approval should funds become available.

SECTION 4. COLLECTION OF TAX. The Authority shall contract with the State Board of Equalization to perform all functions incidental to the administration and operation of this ordinance, including collection of the additional transaction and use tax imposed by this ordinance.

SECTION 5. EFFECTIVE AND OPERATIVE DATES. This ordinance shall become effective on November 7, 1989, only if a majority of the electors voting on the measure at the election held on November 7, 1989, vote to approve the ordinance. If so approved, the provisions of this ordinance shall become operative on the first day of the first calendar quarter commencing more than 120 days after the effective date of this ordinance.

SECTION 6. TERM. The provisions of this ordinance shall no longer be of any force and effect, on or after twenty years following its operative date unless extended by a vote of a majority electors voting at an election called for that purpose by the Authority.

SECTION 7. ANNUAL APPROPTIATION LIMIT. The maximum annual appropriation limit for the Authority is $34,000,000, subject to adjustment or increase as provided by law.

SECTION 8. IMPLEMENTING POLICIES. Upon approval of this ordinance by a majority of the voters, the Authority may adopt

174

policies and take such other action as may be necessary for the implementation of the one-half of one percent (1/2%) transaction and use tax authorized by this ordinance.

SECTION 9. SEVERABILITY. If any section, part, clause or phrase of this ordinance is for any reason held invalid or unconstitutional, the remaining portions shall not be affected but shall remain in full force and effect.

PASSED AND ADOPTED this 9th day of August, 1989, by the following vote:

AYES: Directors Shipnuck, Del Piero and Strasser Kauffman

NOES: Director Petrovic

ABSENT: None

Chair, Board of Directors of
the Monterey County Public
and Improvement Projects
Authority

ATTEST:

ERNEST K. MORISHITA
Secretary of Said Board

I HERBY CERTIFY THAT THE FOREGOING DOCUMENT A TRUE COPY OF THE ORIGINAL ON FILE IN MY OFFICE

DATE February 26, 1990

ERNEST K. MORISHITA. CLERK
OF THE BOARD OF SUPERVISORS OF MONTEREY COUNTY CALIF

BY _____ DEPUTY

4