[No. B004326. Second Dist., Div. Two. Dec. 30, 1985.]

ARVIN UNION SCHOOL DISTRICT et al., Plaintiffs and Appellants, v. JACQUE ROSS et al., Defendants and Respondents.

**Counsel**

Frank J. Fekete, Peter C. Carton, Joanne A. Velman, Stephen L. Hartsell, Dwaine L. Chambers, Roger R. Grass, James P. Fox, District Attorney, and Michael L. Vinson, Deputy District Attorney, for Plaintiffs and Appellants.

John K. Van de Kamp, Attorney General, Charlton G. Holland, Assistant Attorney General, Elizabeth C. Brandt and Peter G. DeMauro, Deputy Attorneys General, for Defendants and Respondents.

OPINION

**COMPTON, J.**—The dispute involved in this appeal arose in the wake of the adoption of Proposition 13 (the Jarvis-Gann initiative) in the June 1978 primary election. That measure imposed severe restrictions on property taxes to be levied and collected by state and local entities. California Constitution, article XIII A, section 1, which incorporated the provisions of Proposition 13, limits ad valorem taxes on real property to 1 percent of full cash value. (Subd. (a).) Excepted from this limitation are "ad valorem taxes or special assessments to pay the interest and redemption charges on any indebtedness approved by the voters" prior to the effective date of the section. (Subd. (b).)[1]

Prior to 1978, plaintiff school districts[2] had conducted "tax override" elections to increase state spending revenue limits for education pursuant to former Education Code section 42244. Since the tax authorized by that statute was a tax on real property, the Department of Education, in a series of guidelines promulgated after the passage of Proposition 13, took the position that the districts were prohibited from collecting the previously approved overrides. Plaintiffs subsequently brought this action seeking a determination that they were entitled to the additional revenue authorized by the voters prior to the adoption of article XIII A. The trial court rendered judgment in favor of defendants,[3] and this appeal followed.

Our analysis of the issues raised by the instant case must begin with a general overview of this state's school financing system as it existed both before and after the passage of Proposition 13.

Prior to the 1977-1978 fiscal year, California had a comprehensive scheme of school aid known as the "Foundation Program." (See former Ed. Code, § 17300 et seq., now § 14000 et seq.) Under this concept, the state set a per-pupil expenditure level that was guaranteed to every school

---

[1]Article XIII A, section 1 provides as follows: "(a) The maximum amount of any ad valorem tax on real property shall not exceed one percent (1 percent) of the full cash value of such property. The one percent (1 percent) tax to be collected by the counties and apportioned according to law to the districts within the counties. (b) The limitation provided for in subdivision (a) shall not apply to ad valorem taxes or special assessments to pay the interest and redemption charges on any indebtedness approved by the voters prior to the time this section becomes effective. [Adopted June 6, 1978.]"

[2]The named plaintiffs are: Kern High School District, DiGiorgio School District, Arvin Union School District, Paso Robles Union High School District, San Luis Coastal Unified School District, and LaHonda-Pescadero Unified School District.

[3]The named defendants are: Jacque Ross, an official of the Department of Education; Wilson Riles, former Superintendent for Public Instruction; Jesse Unruh, State Treasurer; Ken Cory, State Controller, Edmund G. Brown, Jr., former Governor; Mary Ann Graves, Director of the State Department of Finance; and the State of California.

district in the state, provided the district levied a specified tax called the computational tax rate. If local property tax revenues from the computational tax rate were insufficient to raise the foundation program amount per pupil, then the state contributed the difference. If local revenues from this tax rate equaled or exceeded the foundation program level, then the district received only "basic aid" from the state in the amount of $125 per "ADA."[4] Districts that received minimal state aid were known as "basic aid districts." School districts whose assessed valuations were insufficient to meet the foundation program level through the computational tax rate were called "equalization aid" districts, because they received equalization aid from the state in addition to the minimum basic aid.

In the early 1970's, the state's school financing system suffered its first constitutional challenge. In *Serrano* v. *Priest* (1971) 5 Cal.3d 584 [96 Cal.Rptr. 601, 487 P.2d 1241] (*Serrano I*), our Supreme Court warned that if the allegations of plaintiffs' complaint were sustained at trial the system would "fall before the equal protection clause[s]" of the state and federal constitutions. (*Id.*, at p. 589.) As a result, the Legislature attempted to equalize the funding structure by enacting two bills—Senate Bill No. 90 (S.B. 90) and Assembly Bill No. 1267 (A.B. 1267). Although the new law did not purport to alter the basic concept underlying California's school financing system, it did produce significant changes in the way revenue was to be distributed. A major aspect of the program involved the creation of "revenue limits," or limitations on maximum expenditures per pupil exclusive of state and federal categorical support and of funds generated by permissive override taxes. Each district's revenue limit was calculated by determining the amount of general purpose revenues available to the district in 1972 and adjusting annually for inflation. This adjustment was computed on a sliding scale basis so that the districts with higher revenue limits received small annual inflation adjustments and those with lower revenue limits received larger increases.

Under the new system, a school district could exceed its state-imposed revenue limit through certain mechanisms for generating additional property tax revenue. Most relevant here are those provisions of the law which permitted a district to raise its revenue limit by voter approved tax overrides. "Commencing September 4, 1973, the revenue limit . . . may be exceeded upon approval of a majority of the electors of the district voting on a proposition to that effect. . . . Such approval may be granted for any period of

---

[4]Most school aid determinations are based not on total enrollment, but on "average daily attendance" (ADA), a figure computed by adding together the number of students actually present on each school day and dividing that total by the number of days school was taught. For purposes of our discussion, we use the terms "per ADA" and "per-pupil" interchangeably.

time, and shall be *added* to the budget year revenue limit per foundation program unit of average daily attendance of the district . . . in computing the maximum general purpose tax rate for each year in which the voted revenue limit increase is effective. . . . [T]he revenue limit shall be that prescribed by state law plus the amount of increase approved by the electors, . . ." (Former Ed. Code, § 42244, italics added.)

Between 1973 and 1978, plaintiff school districts increased their revenue limits by conducting tax override elections pursuant to the terms of the foregoing statute.[5]

In *Serrano* v. *Priest* (1978) 18 Cal.3d 728 [135 Cal.Rptr. 345, 557 P.2d 929] (*Serrano II*), the Supreme Court affirmed a 1974 trial court judgment holding that the public school financing system, including those changes brought about by the Legislature's response to *Serrano I,* violated the equal protection clause of the state Constitution. In reaching its conclusion, the court specifically delineated four aspects of the system it found most violative of constitutional guarantees: (1) the basic aid payments tended to widen the gap between low-wealth and high-wealth districts; (2) the voted overrides allowed wealthier districts to increase revenue limits, negativing any possible "convergence" of revenues between low- and high-wealth districts; (3) the availability of school revenues was conditioned upon the wealth of the district and as a result a greater tax effort was required of lower wealth districts; and (4) the quality of education was dependent upon the level of district expenditures per pupil. In relation to voted tax overrides, the court emphasized that such taxes "which, while providing more affluent districts with a ready means for meeting . . . legitimate and proper educational objectives, will be recognized by the poorer districts, unable to support the passage of . . . overrides . . . as but a new and more invidious aspect of that 'cruel illusion' [that poorer districts can tax themselves into excellence.]" (*Id.,* at p. 769.)

Immediately following *Serrano II,* the Legislature again attempted to equalize the financing system by passing Assembly Bill No. 65 (Stats. 1977, ch. 894). This measure increased revenue limits and increased the low-revenue districts' financial capacity to raise funds above the foundation program level by means of the Guaranteed Yield Program, a form of what is

---

[5]The tax override elections allowed plaintiff school districts to increase their revenue limits per student as follows: Kern High School District—$282.66; DiGiorgio School District—$400; Arvin Union School Dist.—$140; Paso Robles Union High School District—$254.36; San Luis Coastal Unified School District—$322.44; LaHonda-Pescadero Unified School District—$242. ($94.15 of this amount was added by LaHonda-Pescadero during fiscal year 1977-78.)

known as district power equalization.[6] Under this funding scheme, a district was guaranteed state aid if it taxed itself at a rate set by the Legislature. If the district recovered less than the projected amount when it levied that rate, the state contributed the difference.

AB 65 contained two "squeeze" (i.e., reduction) mechanisms that applied to high-revenue districts. The first squeeze formula applied to all districts whose base revenue limits for the prior year were equal to or greater than the foundation program level for that year. The higher a district's base revenue limit, the lower the inflation adjustment that the district received. The second squeeze formula applied to those high-revenue districts whose prior year base revenue limits were 120 percent or more of the prior year foundation program level.

Before AB 65 could be implemented, however, the electorate approved Proposition 13. The passage of that initiative resulted in an immediate short-fall of $2.8 billion in local funds, and required a new method of school financing heavily skewed toward state funding. To offset the loss in property tax revenue, the Legislature enacted a one-year measure popularly known as the "bail-out" bill. (Stats. 1978, chs. 292, 332.) Under this emergency funding scheme, the state guaranteed every district from 85 percent (for high revenue districts) to 91 percent (for low revenue districts) of the revenue it would have received had the revenue limit formula of AB 65 been implemented. In determining their pre-Proposition 13 revenues, districts were given credit for the funds they received in 1977-1978 from permissive overrides and for voted overrides authorized to be levied in 1977-1978, including unused voted overrides that met certain limited criteria. Once the projected revenues were calculated and the 9 percent to 15 percent cuts made (the "squeeze factor"), the state contributed the difference be-tween that amount and the amount of post-Proposition 13 property taxes allocated to a district. This plan, known as the state "block grant" program, remained in effect until a more comprehensive fiscal relief bill was enacted in mid-1979. (See Stats. 1979, ch. 232.)

In April 1979, however, the Department of Education issued a set of district "guidelines" that purported to interpret Proposition 13 and the sub-sequent "bail-out" legislation. As earlier noted, the department, through defendant Ross, concluded that the previously authorized tax overrides were

---

[6]Under this program, a school district, no matter how poor, would be guaranteed a spec-ified amount of revenue if it taxed itself at a certain rate. The measure was intended to eliminate the effect of differences in the assessed valuation of property from one school district to another. Since high wealth districts had higher assessed valuations, the tax rate produced excess funds which were subject to recapture by the state for redistribution to low wealth districts.

void under article XIII A and thus could no longer be used as a source of additional funding over and above that contributed by the state. The guidelines made clear that the full amount of each override was to be included as part of (i.e., "folded into") the formula used for determining a district's base revenue limit. The overrides also were subject to the various "squeeze" factors discussed, *ante.*[7]

When the department refused to alter its position, plaintiff school districts instituted the underlying litigation. In mid-1979, the Legislature specifically repealed Education Code section 42244.

Following a lengthy trial,[8] the court found "1. Constitutional Article XIIIA invalidated Education Code section 42244 authorizing voter overrides that would increase ad valorem property taxes. 2. Section 4 of Constitutional Article XIIIA prohibits school districts from levying any special ad valorem tax on real property. 3. Section 1b of Constitutional Article XIIIA does not apply to voter overrides since voted overrides are not ad valorem taxes or special assessments to redeem an indebtedness. 4. The Legislature acting fully within the scope of its authority enacted the 'Bail Out Bill' which subjects the revenue limit computed pursuant to [Stats. 1978] chapter 332, section 2, to a squeeze. The voter override is specified as one element of the factor subject to such squeeze and is included in the revenue limit computation. 5. The 'Bail Out Bill' includes in the revenue limit computation either the amount of an override levied in 1977-1978 or overrides authorized to be levied in 1978-1979 but not before. If the electorate did not authorize an increase from the 1977-1978 figure in 1978-1979, the district[s] must use the levied amount for the 1977-1978 fiscal year in computing their revenue limit. 6. The guidelines of the Department of Education are not administrative regulations."

Plaintiffs first argue that because Proposition 13 did not expressly repeal tax override elections authorized by former Education Code section 42244, such repeal may not be inferred. We disagree.

Any ambiguity in the language of article XIII A may be resolved and clarified in accordance with several generally accepted rules of construction used in interpreting similar enactments.

---

[7]Having determined that the voted overrides could not be levied under Proposition 13, the department apparently reasoned that the funds generated therefrom should be included in the revenue limit formula so that the state could continue to provide aid in amounts at least relative to the revenue received before the adoption of article XIII A.

[8]The instant case was consolidated with the *Serrano* v. *Priest* compliance hearing (Judicial Council Coordinated Proceeding No. 1554) and tried concurrently by order of the Judicial Council. The foregoing overview of the state's financing system is derived from the testimony of the various witnesses and properly admitted documentary evidence in these consolidated proceedings. The *Arvin* and *Serrano* cases, each presenting separate but related issues, however, were bifurcated for purposes of this appeal.

■ It is a fundamental precept of our law that, although the legislative power under our constitutional framework is firmly vested in the Legislature, "the people reserve to themselves the powers of initiative and referendum." (Cal. Const., art. IV, § 1.) It follows from this that " ' "[t]he power of initiative must be liberally construed . . . to promote the democratic process." ' " (*Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization* (1978) 22 Cal.3d 208, 219 [149 Cal.Rptr. 239, 583 P.2d 1281]; *Creighton* v. *City of Santa Monica* (1984) 160 Cal.App.3d 1011, 1018 [207 Cal.Rptr. 78].) Courts will therefore interpret a measure adopted by a vote of the people in such a manner as to give effect to the intent of the electorate. (*Diamond International Corp.* v. *Boas* (1979) 92 Cal.App.3d 1015, 1033-1034 [155 Cal.Rptr. 616].)

■ " ' "The words must be read in a sense which harmonizes with the subject-matter and the general purpose and object of the amendment, consistent of course with the language itself. The words must be understood, not as the words of the civil service commission, or the city council, or the mayor, or the city attorney, but as the words of the voters who adopted the amendment. They are to be understood in the common popular way, and, in the absence of some strong and convincing reason to the contrary, not found here, they are not entitled to be considered in a technical sense inconsistent with their popular meaning." ' [Citation.]" (*Creighton* v. *City of Santa Monica, supra,* 160 Cal.App.3d at p. 1018.) ■ "To ascertain the intent of the electorate it is, of course, proper to consider the official statements made to the voters in connection with propositions of law they are requested to approve or reject. [Citations.]" (*Ibid.*)

Bearing in mind these interpretive aids, we first examine the language of article XIII A in light of the political and social milieu that existed at the time the property tax initiative came before the voters.

The major thrust of article XIII A is aimed, of course, at controlling ad valorem property taxes. This concern was stimulated by a rapid increase in property value over recent years. Even assuming property taxes had remained constant, this rapid increase in market value, when reflected in increased assessed value, resulted in large property tax increases which, for the most part, had not been offset by increased income of the property owners. Thus, section 1 limits the ad valorem tax rate to a maximum of 1 per cent of market value; section 2 sets the 1975-1976 tax year as a "base" for assessed value and limits further increases to 2 percent per year; and section 3 provides that the Legislature may not impose new ad valorem taxes on real property.

■ Most relevant to our discussion are the provisions of article XIII A, section 4. That portion of the amendment permits cities, counties, and spe-

cial districts to impose special taxes from *non-property* sources when two-thirds of the voters approve, but it *prohibits* them from levying any special ad valorem taxes on real property.[9] At the time of the 1978 primary election, the Legislative Analyst, referring to this section of the initiative, observed: "[T]his measure would authorize cities, counties, special districts and *school districts* to impose unspecified 'special' taxes only if they receive approval from two-thirds of the voters. *Such taxes could not be based on the value or sale of real property.*" (Ballot Pamp., Tax Limitation Initiative, Analysis by Legis. Analyst, Primary Elec., June 6, 1978, p. 57, italics added.)

After reviewing the language of the amendment and the events that led to its passage, we are convinced that the electorate intended section 4 to apply to school districts, thus limiting their ability to levy ad valorem property taxes. The adoption of article XIII A therefore worked to repeal Education Code section 42244. ■ Although we recognize there is a general presumption against repeals by implication, the presumption may be overcome where the later provision gives undebatable evidence of an intent to supersede the earlier. (*American Friends Service Committee* v. *Procunier* (1973) 33 Cal.App.3d 252, 260 [109 Cal.Rptr. 22].) Such evidence is present here. Education Code section 42244 is simply incompatible with the provisions of article XIII A that prohibit the imposition of additional property taxes.

■ We also have no doubt but that school districts are "special districts" within the meaning of section 4. In *Los Angeles County Transportation Com.* v. *Richmond* (1982) 31 Cal.3d 197 [182 Cal.Rptr. 324, 643 P.2d 941], the Supreme Court concluded that in interpreting Proposition 13, "special districts" are those entities empowered to levy on real property. Education Code section 42244, before its ultimate repeal in the summer of 1979, specifically allowed school districts within the state to conduct override elections and, if successful, levy ad valorem property taxes.

■ Since the tax authorized by section 42244 was a tax on real property, article XIII A, section 4 in effect disallowed past and future increases in the revenue limit established by the state pursuant to the statute.

Plaintiffs next argue that the overrides are exempt from the one per cent limitation set forth in subdivision (a) of the amendment because they constitute ad valorem taxes or special assessments to pay interest and redemption charges on an indebtedness approved by the electorate prior to July 1,

---

[9]Article XIII A, section 4 of the California Constitution provides: "Cities, Counties and special districts, by a two-thirds vote of the qualified electors of such district may impose special taxes on such district, except ad valorem taxes on real property or a transaction tax or sales tax on the sale of real property within such City, County or special district."

1978. The pivotal question is whether the voters of the district assumed an indebtedness as defined in subdivision (b) when they agreed to increase state revenue limits for education by imposition of an additional tax on real property.

We preliminarily note that a voted override pursuant to former Education Code section 42244 is not a special assessment. In *County of Fresno* v. *Malmstrom* (1979) 94 Cal.App.3d 974 [156 Cal.Rptr. 777], the court distinguished between special taxes and special assessments. "A 'special tax' is a tax collected and earmarked for a special purpose, rather than being deposited in a general fund. [Citations.] A special assessment is charged to real property to pay for benefits that property has received from a local improvement and, strictly speaking, is not a tax at all. [Citations.]" (*Id.*, at pp. 983-984.) The court further emphasized that "A special assessment is distinguishable from a property-related special tax by the fact that a special assessment, being a charge for benefits conferred upon the property, cannot exceed the benefits the assessed property receives from the improvement; a special tax on real property need not so specifically benefit the taxed property. [Citations.]" (*Id.*, at p. 984.)

The fact that the vote on the overrides was limited to voters residing in the various school districts, and was earmarked for special purposes, does not make it a "special assessment." An override makes no distinction between those taxpayers who use the public schools and those who do not. The charge is determined solely on the basis of the cash value of the property itself making it an ad valorem tax for a specific purpose instead of an assessment.

We also think it clear that the voted tax overrides are not used to "pay the interest and redemption charges of any indebtedness," but rather serve to generally increase the revenue available to a school district. Although the term "indebtedness" has no fixed or rigid meaning, it generally connotes a vested interest in a creditor and an obligation to pay in a debtor. (See *County of Shasta* v. *County of Trinity* (1980) 106 Cal.App.3d 30, 38-39 [165 Cal.Rptr. 18].) In our view, the word "indebtedness" as used in subdivision (b) refers to an actual debt of an amount certain for money already received, such as upon the sale of construction or improvement bonds, and to be repaid in periodic payments in installments upon principal and interest with the intent and purpose of redeeming the original debt. Whether this definition is exclusive we need not decide, but it would be unreasonable to believe subdivision (b) was intended to include the kind of tax overrides involved here.

As previously noted, the Legislature enacted the "bail-out" bill (Stats. 1978, ch. 332) to provide needed temporary aid to school districts calculated

on the basis of expenditures from the prior year. Since voted overrides could no longer be levied under Proposition 13, the "bail-out" bill provided that the override figure was included into (or "folded" into) the new revenue limit formula so that the state could still provide amounts at least relative to the revenue received in the prior year. Plaintiffs contend that this formula for determining a district's base revenue limit violates that portion of former Education Code section 42244 which provides "[the voted overrides] . . . shall be *added* to the . . . revenue limit per foundation program. . . ." (Italics added.) Again, we must disagree.

When interpretation of a statute, such as the "bail-out" bill, is at issue, special attention must be given to the evils a statute is designed to overcome. (See *Zidell* v. *Bright* (1968) 264 Cal.App.2d 867 [71 Cal.Rptr. 111].) The bill in question was intended to assure adequate support for all public schools and to use the broader based taxing power of the state to raise the level of support in financially weak districts, as required by the Supreme Court in *Serrano II.* Accordingly, chapter 332, section 2, subdivision (a), paragraph (1) of Statutes 1978, included the levied portion of the funds generated by the overrides in the formula for calculating the base revenue limit. The figure derived under subdivision (a) is reduced by the applicable squeeze factor just as the other figures in subdivision (a) are so reduced.

As we see it, this formula properly allocated limited state resources in an amount comparable to that previously relied upon by school districts and, in so doing, attempted to equalize the funding structure, as mandated by *Serrano II,* by deemphasizing voter overrides.

Based upon the foregoing, we can only conclude that the trial court correctly determined that plaintiff school districts were not entitled to the additional revenue generated by the tax overrides.

We have carefully reviewed plaintiffs' remaining contentions and find none that warrant further discussion.[10]

The judgment is affirmed.

Roth, P. J., and Gates, J., concurred.

Appellants' petition for review by the Supreme Court was denied March 27, 1986.

---

[10]Although at the trial level, plaintiff La Honda-Pescadero School District argued that it was entitled to collect previously authorized overrides that had not been levied at the time Proposition 13 became law, it has abandoned that contention on appeal.