[No. C016105. Third Dist. Mar. 28, 1994.]

HOOGASIAN FLOWERS, INC., et al., Plaintiffs and Respondents, v. STATE BOARD OF EQUALIZATION, Defendant and Appellant; SAN FRANCISCO EDUCATIONAL FINANCING AUTHORITY, Interevener and Appellant.

**[Opinion certified for partial publication.*]**

*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of part I of the Discussion.

1266

## COUNSEL

Daniel E. Lungren, Attorney General, Lawrence K. Keethe and Robert D. Milam, Deputy Attorneys General, for Defendant and Appellant.

Heller, Ehrman, White & McAuliffe, David B. Goodwin, Celia M. Jackson and Jeffrey S. Sloan for Intervener and Appellant.

Jonathan M. Coupal and Trevor A. Grimm for Plaintiffs and Respondents.

## OPINION

SIMS, J.—In this action by retailers for a refund of a local sales tax, defendant State Board of Equalization (SBE) and intervener San Francisco Educational Financing Authority (EFA) appeal from summary judgment entered in favor of plaintiffs, Hoogasian Flowers, Inc., Ace Pharmacy, Diane O., and Surf Pharmacy (the retailers). The sales tax at issue in this case was imposed by EFA pursuant to an ordinance approved by a majority (but less than two-thirds) of the qualified electors voting on the measure in the City and County of San Francisco, as authorized by Revenue and Taxation Code

section 7286.1.[1] The trial court determined the majority vote was insufficient because the tax was subject to the two-thirds voter approval requirements of Proposition 13 (Cal. Const., art. XIII A, § 4[2]) for "special taxes" imposed by "special districts."

On appeal, SBE contends the trial court erred in failing to require the retailers to join EFA as a defendant and in entering judgment against SBE because SBE did nothing wrong. In an unpublished portion of this opinion, we reject SBE's contentions. EFA contends summary judgment was improper because the tax was not subject to the supermajority requirements of Proposition 13. In this published portion of the opinion, we reject EFA's argument. We will therefore affirm the judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

In September 1991, the Legislature passed the Educational Financing Act (Senate Bill No. 482), codified at section 7286.1 et seq. That act authorizes the San Francisco Unified School District and the San Francisco Community College District to create an educational financing authority (EFA) "for the general purpose of providing financial assistance to each school district within the city and county." (§ 7286.2, subd. (a).) The act provides that EFA shall be governed by a board of directors which "shall consist of the members of the governing boards of the unified school district and the community college district." (§ 7286.2, subd. (a).) The act authorizes EFA to impose by ordinance a quarter-cent sales tax in the City and County of San Francisco, subject to voter approval. Section 7286.1 indicates that approval by a mere majority of the electors voting on the measure is sufficient.[3]

In October 1991, EFA's board of directors passed an ordinance requesting the City and County of San Francisco to call a special election for the purpose of submitting to the voters a measure for the imposition of a one-quarter of 1 percent transactions and use tax.

---

[1]Undesignated statutory references are to the Revenue and Taxation Code.

[2]California Constitution, article XIII A, section 4, provides: "Cities, Counties and special districts, *by a two-thirds vote of the qualified electors of such district*, may impose special taxes on such district, except ad valorem taxes on real property or a transaction tax or sales tax on the sale of real property within such City, County or special district." (Italics added.)

[3]Section 7286.1 provides in part: "(a) Upon the adoption of a resolution as specified by Section 7286.2 by the governing boards of the San Francisco Unified School District and the San Francisco Community College District, there shall be established in the City and County of San Francisco an educational financing authority in accordance with that resolution. Any authority so established may adopt an ordinance imposing for the authority's general purpose a transactions and use tax at a rate of 0.25 percent, if all of the following requirements are met: [¶] (1) The ordinance proposing that tax is approved by a two-thirds vote of the board of directors of the authority and *by a majority of the qualified voters of the county voting on the measure, or any otherwise applicable voter requirement. . . .*" (Italics added.)

Pursuant to section 7286.1, an election was held in December 1991, and the ordinance imposing the tax was approved by a majority (but less than two-thirds) of the qualified electors voting on the measure. Shortly thereafter, SBE began collecting the tax and distributing the proceeds to EFA, pursuant to a statutorily mandated contract for SBE to administer the tax (§§ 7270, 7286.1, subd. (a)(2)).

The retailers paid the tax and filed claims for refund with SBE on the ground that the tax was unconstitutional under Proposition 13, which requires that special taxes by special districts be approved by two-thirds of the qualified electors voting on the measure. SBE denied the claims on the ground that "Article III, Section 3.5[4] of the California [] Constitution prohibits [SBE] from declaring a statute unconstitutional, or refusing to enforce a statute, on the grounds that it is unconstitutional unless an appellate court has declared the statute unconstitutional."

In October 1992, the retailers filed a complaint for refund of the taxes, naming SBE as defendant. (§ 6933.) SBE demurred on the ground that the real party in interest (EFA) was not named as a defendant. The trial court overruled the demurrer. In March 1993, EFA intervened in the action as a defendant, pursuant to stipulation of the parties and approval by the court.

In April 1993, the retailers moved for summary judgment on the ground the tax was invalid because Proposition 13's supermajority requirement applies to EFA, which is a "special district" within the meaning of California Constitution article XIII A, section 4, because it was created and is controlled by two "special districts," i.e., the San Francisco Unified School District and the San Francisco Community College District. EFA argued inter alia that school districts are not "special districts" within the meaning of California Constitution article XIII A, section 4.[5]

The trial court granted the retailers' motion for summary judgment and entered judgment in favor of the retailers, awarding refunds of $1,126 to Hoogasian Flowers, Inc., $167 to Ace Pharmacy, $186 to Diane O., and $183 to Surf Pharmacy. The trial court also awarded the retailers interest and costs of suit but retained jurisdiction to decide the question of attorney fees until after conclusion of this appeal.

---

[4]California Constitution, article III, section 3.5, provides in part: "An administrative agency, including an administrative agency created by the Constitution or an initiative statute, has no power: [¶] (a) To declare a statute unenforceable, or refuse to enforce a statute, on the basis of it being unconstitutional unless an appellate court has made a determination that such statute is unconstitutional; [¶] (b) To declare a statute unconstitutional . . . ."

[5]In this opinion, our use of "school districts" includes the San Francisco Community College District. (See § 7286.6.)

DISCUSSION

I. *SBE's Contentions**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

II. *EFA's Contentions*

A. *Standard of Review*

■ "The power of the Legislature in the area of taxation is paramount . . . any constitutional restriction on that power must be strictly construed against the limitation." (*Franchise Tax Bd.* v. *Superior Court* (1989) 212 Cal.App.3d 1343, 1347 [261 Cal.Rptr. 236].) Since statutes are "clothed with a presumption of constitutionality," the tax "must be upheld unless it is 'clearly, positively and unmistakably' unconstitutional." (*Ibid.*; see also *People* v. *Hansel* (1992) 1 Cal.4th 1211, 1219 [4 Cal.Rptr.2d 888, 824 P.2d 694].) On review of the grant of summary judgment, our review is de novo. (*Moerman* v. *State of California* (1993) 17 Cal.App.4th 452, 456 [21 Cal.Rptr.2d 329].)

B. *EFA Is a "Special District"*

■ EFA contends it is not a "special district" within the meaning of the California Constitution, article XIII A, section 4 (fn. 2, *ante*) (hereafter, article XIII A, section 4). We disagree.

1. *The Rider Decision*

In *Rider* v. *County of San Diego* (1991) 1 Cal.4th 1 [2 Cal.Rptr.2d 490, 820 P.2d 1000], the Supreme Court held the term "special districts" in article XIII A, section 4, includes local taxing authorities created and controlled by entities subject to Proposition 13 in order to raise funds to replace revenues lost because of Proposition 13. (1 Cal.4th at p. 11.)

The taxing agency in *Rider* was the San Diego County Regional Justice Facility Financing Agency, which had been created by the county to circumvent Proposition 13 and raise funds to finance the construction of county justice facilities. (1 Cal.4th at p. 11.) The Supreme Court held the tax invalid for failure to secure the two-thirds voter approval required by article XIII A, section 4. The *Rider* court began by reiterating that the purpose of article

*See footnote, *ante*, page 1264.

XIII A, section 4, is to place restrictions upon the imposition of additional or increased state or local taxes other than property taxes which would counteract the tax savings derived from the operation of the property tax rate and assessment limitations of Proposition 13. (1 Cal.4th at pp. 6-7.) Article XIII A, section 4, is part of an "interlocking package" to assure effective real property tax relief. (1 Cal.4th at p. 7.)

The Supreme Court in *Rider* revisited its earlier decision in *Los Angeles County Transportation Com.* v. *Richmond* (hereafter *Richmond*) (1982) 31 Cal.3d 197 [182 Cal.Rptr. 324, 643 P.2d 941], which held that an agency lacking the power to impose a tax on real property could not be deemed a "special district" within the meaning of article XIII A, section 4. The *Richmond* court determined that "Proposition 13 was aimed at property tax relief, and [article XIII A,] section 4 thereof was intended to restrict the ability of local taxing agencies to impose new taxes to *replace* the loss of property tax revenue arising from the tax rate and assessment restrictions of that measure." (*Rider, supra,* 1 Cal.4th at p. 7, original italics.) The plurality opinion in *Richmond* reasoned that since only those special districts which levied property taxes could replace revenues lost by Proposition 13, "special districts" in article XIII A, section 4, meant districts authorized to levy property taxes. (See *Rider, supra,* 1 Cal.4th at pp. 7-8, citing *Richmond, supra,* 31 Cal.3d at p. 206.)

As noted by the *Rider* court, the dissenting opinion in *Richmond* "observed that the majority's analysis in *Richmond* could be used to readily circumvent the supermajority vote requirement of [article XIII A,] section 4 'by the simple creation of a district which is geographically precisely coterminous with a county, but which lacks its real property taxing power . . . . The majority has cut a hole in the financial fence which the people in their Constitution have erected around their government. Governmental entities may be expected, instinctively, to pour through the opening seeking the creation of similar revenue-generating entities in myriad forms which will be limited only by their ingenuity.' " (*Rider* v. *County of San Diego, supra,* 1 Cal.4th at p. 8, citing *Richmond, supra,* 31 Cal.3d at p. 213, dis. opn. of Richardson, J.) In response to the dissent, the *Richmond* plurality remarked that there was no issue of intent to circumvent Proposition 13 in the case before the court because the taxing agency at issue in *Richmond* antedated adoption of Proposition 13. (See *Rider, supra,* 1 Cal.4th at p. 8, citing *Richmond, supra,* 31 Cal.3d at p. 208.)

The *Rider* court turned its attention to the question left open in *Richmond* regarding the validity of a taxation scheme enacted for the apparent purpose

of avoiding the supermajority voter approval requirement imposed by article XIII A, section 4. (*Rider* v. *County of San Diego, supra,* 1 Cal.4th at p. 5.) *Rider* determined the San Diego County Regional Justice Facility Financing Agency was a "special district" under article XIII A, section 4, despite its lack of power to levy a tax on real property. (1 Cal.4th at p. 10.) "To hold otherwise clearly would create a wide loophole in Proposition 13 as feared by the dissent in *Richmond.* . . . [T]he evident purpose of [article XIII A,] section 4 was to 'assure effective real property relief' by imposing restrictions on 'additional or increased state or local levies other than property taxes . . . .' [Citation.] *Richmond, supra,* 31 Cal.3d 197, 205-206, makes [article XIII A,] section 4 inapplicable to special taxes levied by local districts which, prior to the passage of Proposition 13, lacked the power to levy real property taxes. The Court of Appeal decision herein [holding the *Rider* tax valid under *Richmond*] would extend *Richmond* to any local district or agency, whenever created, which lacks such power, even if purposefully formed for the sole purpose of circumventing [article XIII A,] section 4. We are convinced the framers of, and voters for, Proposition 13 did not intend that [article XIII A,] section 4 be construed in such a manner." (*Rider, supra,* 1 Cal.4th at p. 10, original italics.) The *Rider* court continued: "It seems evident that *Richmond*'s limitation of the term 'special district' to those districts possessing property tax power is unworkable as applied to districts formed after the adoption of Proposition 13, because to our knowledge *no* such agencies possess that power. With limited exceptions, only *counties* are empowered to levy the 1 percent maximum property tax allowed by Proposition 13. [Citations.] In other words, as a practical matter, the proposed extension of *Richmond* to all districts, whenever created, which lack property tax power would read [article XIII A,] section 4's reference to 'special districts' out of existence as applied to districts formed after 1978.

". . . [Article XIII A,] section 4 of Proposition 13 was intended to restrict the ability of local governments to impose new taxes to replace property tax revenues lost under the other provisions of that measure. [Citation.] This intent would be frustrated if cities and counties were nonetheless permitted to arrange for the formation of local taxing districts to finance municipal functions without securing the requisite two-thirds voter approval.

"Thus, we hold that 'special district' would include any local taxing agency created to raise funds for city or county purposes to replace revenues lost by reason of the restrictions of Proposition 13." (*Rider* v. *County of San Diego, supra,* 1 Cal.4th at p. 11, original italics.)

The *Rider* court stated that in the case before it the evidence was strong that the taxing agency was created in order to circumvent Proposition 13.

(*Rider* v. *County of San Diego, supra,* 1 Cal.4th at p. 11.) The Supreme Court continued on to state that in the absence of evidence of an intent to circumvent Proposition 13, such intent may be inferred from evidence that "the new tax agency is *essentially controlled* by one or more cities or counties that otherwise would have had to comply with the supermajority provision of [Proposition 13]. In determining whether such control exists, a variety of considerations may be relevant, including the presence or absence of (1) substantial municipal control over agency operations, revenues or expenditures, (2) municipal ownership or control over agency property or facilities, (3) coterminous physical boundaries, (4) common or overlapping governing boards, (5) municipal involvement in the creation or formation of the agency, and (6) agency performance of functions customarily or historically performed by municipalities and financed through levies of property taxes." (1 Cal.4th at pp. 11-12, original italics.)

Thus, *Rider* limited *Richmond* to taxing agencies formed before the 1978 passage of Proposition 13 and held that as to taxing agencies formed after passage of Proposition 13, "special district" under article XIII A, section 4, includes local taxing authorities created to raise funds to replace revenues lost because of Proposition 13, regardless of whether the taxing agency has the power to levy real property taxes.

EFA reads *Rider* too narrowly by arguing it (EFA) is not a special district under the *Rider* analysis since EFA is not essentially controlled *by a city or county.* It is true *Rider* mentioned control by a city or county. However, *Rider* spoke in terms of municipal control because the creating entity there at issue was a county. We disagree with EFA's view that under *Rider* "special district" means *only* taxing entities controlled by a city or county. *Rider* held "special district" *includes* taxing agencies controlled by a city or county (1 Cal.4th at p. 11); it did not hold "special district" means *only* those agencies. The lesson of *Rider* is that entities subject to article XIII A, section 4, cannot circumvent the constitutional restrictions through the device of creating new entities to do what the creating entity cannot do. Thus, accepting for the sake of argument that the City and County of San Francisco does not control EFA, we nevertheless do not consider that lack of control dispositive. The material questions are whether EFA was created and is controlled by an entity that is subject to Proposition 13's supermajority requirement.

It is undisputed that EFA was created by the San Francisco Unified School District and the San Francisco Community College District. (§ 7286.1, at fn. 3, *ante.*) EFA does not dispute that it is controlled by those two school

districts. Instead, EFA merely argues that school districts are not "special districts" within the meaning of article XIII A, section 4 (fn. 2, *ante*).[6] We disagree.

The term "special district" in article XIII A, section 4, is ambiguous. (*Richmond, supra,* 31 Cal.3d at p. 205.) ■ "Where a provision in the Constitution is ambiguous, a court must ordinarily adopt that interpretation which carries out the intent and objective of the drafters of the provision and the people by whose vote it was adopted." (*Mosk* v. *Superior Court* (1979) 25 Cal.3d 474, 495 [159 Cal.Rptr. 494, 601 P.2d 1030].)

■ That Proposition 13 was meant to apply to school districts is clear from the ballot materials presented to the voters. The Ballot Pamphlet's "Analysis by Legislative Analyst" told the voters: "Under existing law cities, counties, *schools* and special districts are permitted to levy local property taxes." (Ballot Pamp., Tax Limitation Initiative, Analysis by Legis. Analyst, Primary Elec. (Jun. 6, 1978) p. 56, italics added.) With reference to article XIII A, section 4, the legislative analysis told the voters: "This measure would authorize cities, counties, special districts and *school districts* to impose unspecified 'special' taxes only if they receive approval by two-thirds of the voters. Such taxes could not be based on the value or sale of real property. [¶] The Legislative Counsel advises us that provisions in the existing Constitution would prohibit general law cities, counties, *school districts* and special districts from imposing new 'special taxes' without specific approval by the Legislature. Such restrictions limit the ability of these local governments, even with local voter approval, to replace property tax losses resulting from the adoption of this initiative." (*Id.* at pp. 57, 60, italics added; see also *Arvin Union School Dist.* v. *Ross, supra,* 176 Cal.App.3d 189, 199 [citing Proposition 13 election materials as support for view that article XIII A, section 4, applies to school districts][7].) ■ The legislative analysis contained in the ballot pamphlet is an accepted source

---

[6]EFA claims that under *Rider* school districts cannot be considered special districts under article XIII A, section 4, unless the school districts are controlled by a city or county. As we have explained, however, EFA misreads *Rider*, which did not limit its definition of special district in the manner proposed by EFA. Moreover, the school districts probably antedate Proposition 13. Under *Rider*, the *Richmond* rule (that only entities empowered to levy real property taxes can be "special districts") continues to apply to agencies created before adoption of Proposition 13. (*Rider* v. *County of San Diego, supra,* 1 Cal.4th at p. 11.) EFA does not contend school districts are not "special districts" under *Richmond*. (See *Arvin Union School Dist.* v. *Ross* (1985) 176 Cal.App.3d 189, 199 [221 Cal.Rptr. 720] [school districts are special districts under *Richmond*].)

[7]EFA claims *Arvin*'s statement was dictum. We disagree. Thus, *Arvin Union School Dist., supra,* 176 Cal.App.3d 189, held school districts were not entitled to continued collection of certain property taxes because the statute authorizing the taxes had been repealed by implication by the passage of Proposition 13. The court said: "After reviewing the language of the amendment and the events that led to its passage, we are convinced that the electorate

from which to ascertain the voters' intent, because we assume the voters considered it along with other materials in the ballot pamphlet. (*San Francisco Taxpayers Assn.* v. *Board of Supervisors* (1992) 2 Cal.4th 571, 579 [7 Cal.Rptr.2d 245, 828 P.2d 147].)

EFA cites authorities holding that election materials are helpful but "not conclusive" in determining the probable meaning of initiative language. (E.g., *San Francisco Taypayers Assn.* v. *Board of Supervisors, supra,* 2 Cal.4th 571, 579-580; *Delaney* v. *Superior Court* (1990) 50 Cal.3d 785, 802-803 [268 Cal.Rptr. 753, 789 P.2d 934]; *Carman* v. *Alvord* (1982) 31 Cal.3d 318, 330 [182 Cal.Rptr. 506, 644 P.2d 192].) However, the cited cases grappled with conflicting evidence of intent within election materials or between election materials and the measure itself. Thus, *Carman* v. *Alvord, supra,* 31 Cal.3d at pages 330-331, rejected a Legislative Analyst's interpretation contained in a ballot pamphlet because the analyst's view was contradicted by the measure's official title and summary which were also contained in the ballot pamphlet. *Delaney* v. *Superior Court, supra,* 50 Cal.3d at pages 802-803, rejected an interpretation inferrable from ballot arguments because that interpretation would conflict with the measure itself. The issue in *Delaney* was whether the protection of "unpublished information" in the newspersons' shield law (Cal. Const., art. I, § 2, subd. (b)) included a newsperson's nonconfidential eyewitness observations of an event in a public place. The ballot arguments, which emphasized confidentiality, supported an inference that the measure was limited to confidential information. (*Delaney, supra,* 50 Cal.3d at pp. 802-803.) However, the court concluded such an inference would conflict with the measure itself, which protected "any unpublished information." (*Ibid.*) *San Francisco Taxpayers Assn., supra,* 2 Cal.4th at pages 579-580, rejected a Legislative Analyst's ballot analysis because it did not take into account a provision of the measure which expressly contradicted the analyst's interpretation.

Thus, evidence of the meaning of a measure contained in election materials is not conclusive if inconsistent with other evidence. ■ Here, however, there is no conflict. The only evidence of intent is that article XIII A, section 4, was meant to apply to school districts.

EFA suggests the Legislative Analyst's interpretation contained in the ballot pamphlet conflicted with the measure itself, because article XIII A,

intended [article XIII A,] section 4 to apply to school districts, thus limiting their ability to levy ad valorem property taxes. The adoption of article XIII A therefore worked to repeal Education Code section 42244." (176 Cal.App.3d at p. 199.) Had the school districts not been "special districts" within the meaning of article XIII A, section 4, the court would not have needed to reach the issue it decided. Thus, the court's statement that school districts are "special districts" within the meaning of article XIII A, section 4, was not dictum. In any event, our conclusion here is not dependent upon *Arvin* but on the election materials themselves.

section 4, nowhere mentions school districts. The measure specifies only cities, counties, and special districts. Since the Legislative Analyst's comments referred to "special districts *and* school districts" (italics added), EFA argues the Legislative Analyst was not construing the term "special district" but was attempting to change the measure by injecting a new term contrary to the express language of the measure. Otherwise, says EFA, the Legislative Analyst would have said "special districts, *including* school districts."

We believe EFA is asking us to apply rules of construction to the Legislative Analyst's comments, and such an application is unwarranted. We do not view the legislative analysis as conflicting with the language of the measure or as attempting to change the measure. Rather, we view it as an inartful yet clear message that the ambiguous term, "special district," as used in the measure includes school districts. The critical point is that the voters understood article XIII A, section 4, to apply to school districts. Construing special districts to include school districts gives effect to the voters' intent in adopting Proposition 13.

EFA cites the following dictum in *California Bldg. Industry Assn.* v. *Governing Bd.* (1988) 206 Cal.App.3d 212 [253 Cal.Rptr. 497]: "The reference by Legislative Counsel [in the ballot pamphlet] to 'school districts,' as separate and distinct from 'special districts,' raises a question as to whether the latter term embraces the former. Our review of the applicable authorities strongly suggests to us that the terms 'special district' and 'district,' as used in article XIII A and related legislation, do not include the school districts. (See *Los Angeles County Transportation Com.* v. *Richmond* (1982) 31 Cal.3d 197, 205-206 []; Cal. Const., art. XIII, § 21 [formerly art. IX, § 6 (¶ 6)]; *McDonald* v. *Richards* (1926) 79 Cal.App. 1, 8-10 [] [discussing the power of a school district to levy taxes under art. XI, § 12 (now art. XIII, § 24) after art. IX, § 6 (now art. XIII, § 21) was added to the Const.].)" (206 Cal.App.3d at p. 223, fn. 11.) However, EFA neglects to mention the remainder of the footnote, where the court states: "However, neither the parties nor amici have seen fit to raise or discuss this issue in their briefs. Indeed, Building Industry, in response to our postargument inquiry, has conceded that factors are present 'which indicate that school districts might be considered "special districts" for purposes of Article XIII A.' In view of such concession and lack of dispute, as well as our resolution of the case on other grounds, we do not reach or further discuss this issue." (206 Cal.App.3d at p. 223, fn. 11.) Thus, the *California Bldg. Industry Assn.* court did not decide the issue before us and does not constitute authority on the matter. (*Ginns* v. *Savage* (1964) 61 Cal.2d 520, 524, fn. 2 [39 Cal.Rptr. 377, 393 P.2d 689].) Moreover, we have reviewed the authorities cited in that case and do not locate the source of the "strong suggestion" noted by the court.

EFA claims to have evidence that the drafters of Proposition 13 intended to exclude school districts from article XIII A, section 4. Thus, EFA points out that article XIII B (Government Spending Limitations), which was added to the state Constitution a year after adoption of Proposition 13, distinguishes between "special district" and "school district" by specifying that the measure applies to both.[8] In EFA's view, article XIII B somehow constitutes a retroactive declaration of drafters' intent as to article XIII A, and that intent was to exclude school districts from the meaning of "special district." However, even assuming for the sake of argument that the same framers drafted both measures, and even assuming that XIII B demonstrates the drafters' intent regarding the measure adopted the previous year, we would not consider EFA's argument persuasive. ■ An after-the-fact declaration of intent by a drafter of Proposition 13 may deserve some consideration but does not govern the court's determination as to how the voters understood an ambiguous provision. (*Carman* v. *Alvord, supra,* 31 Cal.3d at p. 331, fn. 10.) ■ In any event, we do not believe that article XIII B's express reference to "school district" as distinct from "special district" casts any light on the omission of the term "school district" from article XIII A, in view of the election materials we have already discussed. That the clear expression of intent to include school districts appears in the text of article XIII B does not detract from the presence of a clear expression of intent to include school districts in article XIII A. As to article XIII A, the intent merely appears in the ballot materials rather than the text of the initiative.

EFA also cites 69 statutes which define or distinguish between special districts and school districts in a variety of contexts ranging from the Election Code to the Water Code. EFA claims these statutes constitute a legislative interpretation of the meaning of "special districts" in article XIII A, section 4, and that this interpretation is entitled to great deference. We disagree.

■ It is true the Supreme Court has said that the Legislature's interpretation of a constitutional term is relevant to an assessment of the intention of the electorate. (*Richmond, supra,* 31 Cal.3d at p. 206.) However, we think this canon of construction must be used with caution when interpreting an initiative measure. The Legislature is not always enamored with initiative measures enacted by the voters. The Legislature ought not to be able to frustrate the intent of the electorate by enacting statutes that frustrate the popular will. Consequently, although we will examine statutes enacted in

---

[8]California Constitution, article XIII B, section 8 (Definitions), defines "Local government" to mean "any city, county, city and county, school district, special district, authority, or other political subdivision of or within the State."

light of the subject constitutional provision, we will continue to give greater significance to the will of the electorate itself.

■ In any event, the statutes cited by EFA do not support its position. Most of the cited statutes are unrelated to Proposition 13 and therefore do not help construe the meaning of article XIII A, section 4. "[T]he Legislature has employed the term 'special district' in a number of different ways on different occasions. No attempt need be made to reconcile them all." (*Howard Jarvis Taxpayers Assn.* v. *Whittier Union High School Dist.* (1993) 15 Cal.App.4th 730, 736 [19 Cal.Rptr.2d 109].) We therefore consider only those statutes which EFA claims were enacted to implement Proposition 13.

The only statutes which EFA specifically claims to be related to Proposition 13 are sections 69.5, 95, 2215, and Government Code section 16271, subdivision (d).

Section 69.5 allows persons who are disabled or over the age of 55 years to transfer the base-year value of a residence to a replacement dwelling, subject to consultation between the county board of supervisors and all "local affected agencies." (§ 69.5, subd. (a)(2).) "Local affected agency" is defined as "any city, special district, school district, or community college district which receives an annual property tax revenue allocation." (§ 69.5, subd. (g)(12).) EFA contends that because "special district" and "school district" are discrete items in a disjunctive in section 69.5, "special district" in article XIII A, section 4, cannot be construed to include school districts. We disagree. We do not believe section 69.5 creates any conflict with the clear intent inartfully expressed in the election materials for article XIII A, section 4.

The next statute cited by EFA is section 95, which contains definitions for a chapter on allocation of property tax revenues (§§ 95-100). Section 95 contains a definition of "special district" as used in the chapter and provides in part: " 'Special district' does not include a city, a county, a school district or a community college district." (§ 95, subd. (m).) Contrary to EFA's position, we cannot conclude that the exclusion of school districts from section 95 casts any light on the meaning of special district in article XIII A, section 4. Section 95 is part of a chapter on allocation of tax revenues. The chapter specifies the manner of calculating the amounts to be allocated to special districts. (E.g., §§ 97.31-97.32.) However, school districts are subject to a different method of calculation, based on the school district's average daily attendance. (§ 75.70.) There thus appears to be a basis for excluding school districts from section 95 that is not material to the construction of article XIII A, section 4.

The next statute cited by EFA is section 2215, which is part of the chapter on reimbursement for costs mandated by the state. (§§ 2201-2216.) Section 2215 defines "special district" as used in the chapter and provides in part: " 'Special district' does not include a city, a county, a school district or a community college district." However, the chapter contains provisions regarding state-mandated costs unique to school districts. (§ 2207.5.) Thus, the separate treatment of school districts and special districts in section 2215 does not lead to the conclusion that "special districts" in article XIII A, section 4, excludes school districts.

The last statute cited by EFA is Government Code section 16271, subdivision (d). That statute is part of a chapter (§§ 16270-16279.5) which provided for distribution of a $125 million fund (Gov. Code, § 16272) for the 1978-1979 fiscal year among special districts, as defined in that chapter, which had the ability to raise revenue through user charges and fees and which lost the ability to raise revenue directly from property taxes by virtue of Proposition 13 (§ 16270). Government Code section 16271, subdivision (d), defines special district and provides in part: " 'Special district' does not include a city, a county, a school district or a community college district." We cannot conclude that the Legislature's exclusion of school districts from entitlement to share in that fund constitutes a legislative interpretation of "special districts" within the meaning of article XIII A, section 4.

To the contrary, we agree with the retailers that other statutory provisions reflect the Legislature's understanding that article XIII A, section 4, applies to school districts. Thus, Education Code sections 43040-43052, address voter-approved special taxes for new school facilities for the Chino Unified School District. Education Code section 43041, subdivision (a)(1), provides: "The special tax has been approved, pursuant to Section 4 of Article XIII A of the California Constitution, by two-thirds of the voters of the school district voting upon the proposition to authorize the governing board of the school district to levy the special tax."

We conclude EFA's reliance on statutory definitions of "special district" is unavailing.

We conclude "special districts" within the meaning of article XIII A, section 4, includes school districts.

Since article XIII A, section 4, applies to school districts, a taxing agency created and controlled by school districts is subject to article XIII A, section 4. Here, it is clear that EFA was created and controlled by school districts, and EFA makes no argument to the contrary.

We conclude EFA is a "special district" within the meaning of article XIII A, section 4.

### 2. *"Retroactivity" of Rider*

■ EFA contends *Rider* does not apply retroactively to this case. We disagree.

In discussing the applicability of its definition of "special district" to taxing agencies created after passage of Proposition 13 but before *Rider* was decided, the *Rider* court said: "We [] leave open the question of a possible prospective application of our holding to agencies other than the Agency involved herein. The issue of prospectivity involves difficult constitutional and policy considerations largely unbriefed in this case." (1 Cal.4th at p. 13.) In addition, resolution of the prospectivity issue may depend on a variety of case-specific factors, including the degree of hardship or other adverse consequences that would result from a retroactive application of our holding in a particular setting. Under these circumstances, we believe that any blanket pronouncement on the prospectivity issue at this time would be inappropriate.

In *Monterey Peninsula Taxpayers Assn.* v. *County of Monterey* (1992) 8 Cal.App.4th 1520 [11 Cal.Rptr.2d 188], the Sixth District found no impediment to retroactive application of *Rider* on a case-by-case basis to a taxing agency in existence before *Rider* became final. (8 Cal.App.4th at pp. 1536-1543.) EFA challenges *Monterey Peninsula*'s conclusions that *Rider* had retroactive effect because it merely clarified existing law and was foreseeable. However the *Monterey Peninsula* court further concluded retroactive application of *Rider* does not contravene public policy where its application would not impose unexpected and unreasonable hardships apart from those the tax was intended to alleviate. (*Ibid.*) We agree with the latter conclusion and find it sufficient to dispose of this case.

Here, the sequence of events was: (1) adoption of Proposition 13; (2) creation of EFA; (3) election in which voters approved EFA's tax; (4) *Rider* opinion issued (one week after the election); (5) *Rider* became final; and (6) SBE began to collect the tax.

Since the *Rider* opinion became final before SBE began collecting the tax, the retailers argue this is not a true question of retroactivity. EFA responds the question of retroactivity turns on whether the tax statute was enacted before *Rider*, not whether the tax was collected before *Rider*. We will therefore consider the question of retroactivity.

The trial court's order granting summary judgment states: "No hardship or significant adverse factors exist which might prevent *Rider* from applying. No employees, structures, or other facilities were hired or commenced in reliance upon the provisions of [] section 7286.1 and 7286.2. The complicity of the Legislature in the attempt to circumvent Proposition 13 does not provide any justification for this tax. More importantly, however, is the fact that the district levied the tax *after Rider* was decided. This Court concludes, as a matter of law, that the issue of 'retroactive application' need not be addressed under the circumstances of this case."

We agree with the trial court that no hardship is shown that would preclude application of *Rider* to this case. Thus, EFA does not dispute that no employees, structures, or other facilities were hired or commenced in reliance on this tax. Instead, EFA argues only that prejudice is shown by the mere fact that school children will not receive the tax money, and the tax money is essential to prevent severe cutbacks in the school system. However, *Rider*'s reference to "hardship" must necessarily mean something more than the need for tax money because otherwise the exception would swallow the rule. We agree with the Sixth District that avoidance of a retroactive application of *Rider* requires a showing that its application would impose unexpected and unreasonable hardships "apart from those the tax was intended to alleviate." (*Monterey Peninsula Taxpayers Assn., supra,* 8 Cal.App.4th at p. 1542.)

We conclude EFA fails to show the requisite hardship to avoid applicability of *Rider* to this case.

C.  *"Special Tax"*

EFA next contends that even if it is a special district, the tax at issue in this case is a general rather than a special tax and therefore is not subject to the supermajority requirement of article XIII A, section 4 (fn. 2, *ante*). We disagree.

*Rider* rejected a similar argument by the San Diego County Regional Justice Facility Financing Agency. (*Rider* v. *County of San Diego, supra,* 1 Cal.4th at pp. 13-14.) The taxing agency there argued its tax was a general tax because its revenues were not earmarked for any special purposes within the agency but were to be placed in the agency's general fund for " 'the general governmental purposes of the agency . . . .' " (1 Cal.4th at p. 13, citing Gov. Code, § 26272.) The Supreme Court disagreed, as follows:

"In *City and County of San Francisco* v. *Farrell* [1982] 32 Cal.3d 47 [184 Cal.Rptr. 713, 648 P.2d 935] (*Farrell*), we addressed the meaning of the

phrase 'special taxes' in [article XIII A,] section 4. The City and County of San Francisco (the City) had imposed a payroll and general receipts tax, the proceeds of which were to be placed in the City's treasury to be used for general governmental expenditures. Because the tax had been approved by a mere majority of the City's voters, a question arose as to the application of section 4.

"The *Farrell* majority observed that 'special taxes' was an ambiguous term that has been given varying interpretations, but that applying settled interpretive principles (including *Richmond*'s rule of strict construction), the term as used in [article XIII A] section 4 means 'taxes which are levied for a specific purpose rather than, as in the present case, a levy placed in the general fund to be utilized for *general governmental purposes*.' (32 Cal.3d at p. 57, italics added.) Because the City's payroll tax revenues were to be used for general City expenses, the tax was deemed a 'general' one beyond the reach of section 4.

"Justice Richardson again dissented, believing the majority 'widens still further the hole which they have cut in that protective fence which the people of California thought they had constructed around their collective purse' by adopting Proposition 13. [Citations.] Justice Richardson observed the *Farrell* rationale would allow a municipality to recover completely any property tax revenues lost under Proposition 13 merely by enacting an alternative form of taxation, the revenues of which being earmarked for general governmental purposes. [Citation.]

"We believe the *Farrell*, *supra*, 32 Cal.3d 47, rationale does not extend to limited purpose agencies such as the Agency herein. To hold that a tax cannot be deemed a 'special tax' if revenues thereof are deposited in the taxing agency's general fund pulls any remaining teeth from [article XIII A] section 4's restriction on special taxes. . . ." (*Rider* v. *County of San Diego*, *supra*, 1 Cal.4th at pp. 13-14.)

*Rider* also rejected arguments that the San Diego County Regional Justice Facility Financing Agency's tax was a general tax because the authorizing legislation called it a "general tax" to be used for "general governmental purposes." (*Rider* v. *County of San Diego*, *supra*, 1 Cal.4th at pp. 14-15, citing Gov. Code, §§ 26251, 26272.) "[T]he Legislature's designation of the tax as a 'general tax,' . . . is of minor importance in light of the realities underlying its adoption and its probable object and effect. [Citation.] The statute at issue was undoubtedly drafted with [article XIII A,] section 4 and *Farrell*'s (*supra*, 32 Cal.3d 47) holding firmly in mind.

"Nor can we accept defendants' 'general fund' argument. It is undisputed that if the County had directly adopted the tax in question, earmarking its revenues for the special, limited purpose of financing the County's justice facilities, it would have been deemed a 'special tax' under *Farrell.* As plaintiffs observe, it would be anomalous if the 'special' tax of one agency could so readily become the 'general' one of another. Under defendants' proposed test, the Legislature could readily avoid [article XIII A,] section 4's supermajority voter approval requirement by simply creating a local taxing agency to accomplish a specific, narrow governmental purpose (e.g., lifeguard towers for county beaches), and provide that tax revenues shall be deposited in the agency's 'general fund' for the 'general governmental purposes' of that agency.

"A more reasonable interpretation of [article XIII A,] section 4, consistent with *Farrell*'s (*supra*, 32 Cal.3d 47) guidelines, is that a 'special tax' is one levied to fund a specific government project or program, such as the construction and financing of the County's justice facilities. It is true that, under the foregoing principle, every tax levied by a 'special purpose' district or agency would be deemed a 'special tax.' But this interpretation seems most consistent with the probable intent of the framers of Proposition 13." (*Rider* v. *County of San Diego, supra,* 1 Cal.4th at p. 15, original italics.)

Here, EFA challenges the retailers' assertion that school districts are "by definition" limited purpose districts. EFA argues school districts are not limited purpose districts but are general purpose entities with even greater powers than general law cities. EFA cites Government Code section 34102, which provides: "Cities organized under the general law shall be 'general law cities.'" EFA fails to explain how this statute supports its position, since school districts are a type of *non*municipal public corporation. (*Howard Jarvis Taypayers Assn.* v. *Whittier Union High School Dist., supra,* 15 Cal.App.4th at p. 733.) EFA also cites Education Code section 35160, which provides: "On and after January 1, 1976, the governing board of any school district may initiate and carry on any program, activity, or may otherwise act in any manner which is not in conflict with or inconsistent with, or pre-empted by, any law and which is not in conflict with the purposes for which school districts are established." In our view, this statute merely establishes that school districts enjoy broad powers within the scope of their limited purpose of assisting education.[9] Moreover, "a 'special tax' is one levied to fund a specific governmental project or program . . . ." (*Rider* v. *County of San Diego, supra,* 1 Cal.4th at p. 15.) Here, the tax was one levied to fund a

---

[9]We note school districts' powers are not limited to educational services but extend to noneducational supplemental services. (See *Arcadia Unified School Dist.* v. *State Dept. of*

specific government program—education. That the authorizing legislation referred to the "general purpose" of financially assisting schools (§ 7286.1, at fn. 3, *ante*; § 7286.2[10]) is of no consequence. (*Rider, supra,* 1 Cal.4th at p. 15.)

We conclude the tax at issue in this case is a "special tax" within the meaning of article XIII A, section 4.

We conclude the tax imposed by EFA was subject to article XIII A, section 4. Since the tax was not approved by two-thirds of the electors voting on the measure, the tax was invalid. We note our conclusion does not mean that the authorizing legislation is invalid. Section 7286.1, subdivision (a)(1) (fn. 3, *ante*), provides that the tax must be approved by a majority of the electors voting on the measure, "or any otherwise applicable voter requirement." (Fn. 3, *ante*.) Proposition 13 is an otherwise applicable voter requirement pursuant to section 7286.1.

## DISPOSITION

The judgment is affirmed.

Puglia, P. J., and Raye, J. concurred.

The petition of appellant San Francisco Educational Financing Authority for review by the Supreme Court was denied July 21, 1994. Mosk, J., Kennard, J., and Werdegar, J., were of the opinion that the petition should be granted.

---

*Education* (1992) 2 Cal.4th 251, 263 [5 Cal.Rptr.2d 545, 825 P.2d 438]; *Howard Jarvis Taxpayers Assn.* v. *Whittier Union High School Dist., supra,* 15 Cal.App.4th 730.)

[10]Section 7286.2, subdivision (a), provides in part: "A resolution establishing an educational financing authority pursuant to Section 7286.1 shall provide for the establishment of an educational finance authority for the *general purpose* of providing financial assistance to each school district within the city and county. . . ." (Italics added.)